Bowman *v.* Gum, Incorporated, et al., Appellants.

Argued March 23, 1936. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Daniel C. Donoghue,* with him *Walter T. Fahy,* for appellants.

*Harry Shapiro,* for appellèe.

OPINION BY MR. JUSTICE LINN, April 13, 1936:

Defendants appeal from an order appointing a temporary receiver for a solvent business corporation, Gum, Incorporated. The appointment was made after preliminary hearing on a bill,[1] filed by a shareholder owning one-half the capital stock, alleging a conspiracy on the part of defendants[2] to conduct the affairs of the corporation in their own, instead of the corporate, interest.

The plaintiff, J. Warren Bowman, on and prior to December, 1930, trading as By-Gum Company, was engaged in the manufacture and sale of chewing gum. The insoluble chewing gum base, or principal ingredient used in manufacturing his product, he purchased from one of the defendants, Sweets Laboratories, Incorporated, hereafter called Sweet. On December 3, 1930, a somewhat informal agreement in writing was signed by the plaintiff, and by Franklin V. Canning, acting on behalf of Sweet, the effect of which was that for $15,000, paid by Sweet, it became the owner of a half interest in the business theretofore conducted by Bowman, with the understanding that the enterprise should be incorporated, each interest to receive one-half the capital stock; it was also agreed that the new company would execute obligations and deliver them to Sweet for money then owed for material purchased by Bowman. They agreed

---

[1] The bill was filed February 11, 1936; the preliminary hearing took place on various days from February 13th to February 19th; an answer was filed February 14th; the receiver was appointed on February 21st; he qualified February 26th; the appeal to this court was taken March 3d; supersedeas was granted March 10th; the appeal was argued March 23d.

[2] The defendants are Gum, Incorporated, Sweets Laboratories, Incorporated, Franklin V. Canning, S. J. Hamilton, Walter T. Fahy and John O. Barker. Canning was chairman of the board of directors of Gum, Incorporated; Hamilton, a director, was elected president at a special meeting of the board; Fahy and Barker were directors; Canning and Hamilton also were respectively president and vice-president of Sweets Laboratories, Incorporated.

that each interest should have equal representation on the board of directors. Instead of incorporating immediately, the business appears to have been conducted informally until May, 1932, when the contemplated corporation was formed and the business transferred. The name of the corporation is Gum, Incorporated, hereafter called Gum. It took over the business May 15, 1932, with a capital contribution by plaintiff of $2,826.52 and by Sweet of $15,000. At that time the corporation assumed the indebtedness of By-Gum to Sweet in a sum in excess of $70,000, incurred, as Mr. Bowman testified, for "money advanced by Sweet for the use of the business." The plaintiff was made president of the company and he and his wife were elected directors. At the same time, on behalf of Sweet, Messrs. Barker and Ryan were elected directors. For each year from 1932 to the time the bill was filed, the business increased and became very profitable. By the consent of both interests in January, 1935, the number of directors was increased to six.

The bill avers and the evidence shows that at a corporate meeting held June 7, 1932, it was provided that all the chewing gum base to be used by Gum should be purchased from Sweet.[3] Pursuant thereto, Gum purchased its base from Sweet. The bill also avers and the answer admits that, as of December 31, 1935, the assets of Gum "(after full allowance for depreciation, obsolescense, bad debts and losses) was the sum of $261,293.68 as against total liabilities of $100,290.34" and that, of the liabilities, $86,059 was due to Sweet. It also appears that $56,000 of that indebtedness is represented by a demand note for part of the account assumed by Gum at the time of the organization in 1932. Defendant, Sweet, from time to time demanded payment of Gum's debt, but the plaintiff, Bowman, as president and

---

[3] Bowman testified that at the time he stipulated that "the quality of your base will always be equal to that of any other base, and also your price will always be fair."

in charge of the operations of Gum, was of opinion that the corporation was unable to pay. By the end of 1935 Mr. Bowman thought "a better chewing gum base was available from another manufacturer at a cost of 20¼ cents per pound" instead of 34 cents then being paid to Sweet; the price was reduced to 34 cents from 36 cents in November, 1935, as we understand the record. Bowman began experimenting with other bases; Sweet objected to the experiments. The ground of objection was the threat to Sweet's outlet for the sale of base manufactured by it. These differences between the two interests—the nonpayment of Gum's debt and the threat to Sweet's market—seem to be the ostensible causes of this litigation.

We have, then, a solvent corporation conducting a manufacturing business that has been very successful. Half the shares are held by the plaintiff and half by Sweet. If each half-interest continues to oppose the other, the business will of course stop. It has been said that such corporations may be regarded as having provided their own legislatures,[4] and to these the parties

---

[4] "Corporations are in a certain sense legislative bodies. They have a legislative power when the directors or shareholders are duly convened that is fully adequate to settle all questions affecting their business interests or policy, and they should be left to dispose of all questions of that nature without applying to the courts for relief. A stockholder in a corporation cannot successfully invoke the powers of a chancery court to control its officers or board of managers, or to wrest the corporate property from their charge through the agency of a receiver, so long as they neither do nor threaten to do any fraudulent or ultra vires acts, and so long as they keep within the limits of by-laws which have been prescribed for their governance. If in either of the cases last specified a stockholder is nevertheless dissatisfied with the business policy that is being pursued, or the methods of corporate management, he must seek redress within the corporation, in the mode prescribed by its charter and by-laws, rather than by an appeal to the court." THAYER, J., in *Republican Mountain Silver Mines v. Brown,* 58 Fed. 644, 647 (1893).

now resorted. The plaintiff began by giving notice for a special meeting of the stockholders to be held February 11, 1936, at 3 o'clock. His intention (as subsequently carried out) was to remove the then existing board of directors and to elect a new board by the vote of his half-interest in accord with a section of the by-laws so permitting. His move was countered by the Sweet interest by the written request of three directors desiring Bowman, as president, to call a special meeting of the board to be held on February 10, 1936; when they concluded that he would not comply with their request, they themselves, under a provision of the by-laws, called a special meeting of the board to be held on that date. This meeting was held at the time and place designated in defendant's manufacturing plant and was attended by five of the six directors, the only absentee being the plaintiff. Instead of attending, he set up a dictograph in the meeting room with an arrangement by which he, in another room in the same building, hoped to hear the discussion.[5] At that meeting the plaintiff was removed from the presidency by the unanimous vote of the other five directors who then elected Hamilton to that office.[6] The special meeting of the stockholders called at plaintiff's instance was held the next day at the time and place specified, though after plaintiff's bill was filed, and a new board of directors was elected, each half shareholding interest

---

[5] Mr. Canning testified "When the meeting was called I asked, 'Where is Mr. Bowman?' I took out my watch and I said, 'The meeting is called for three o'clock.' I asked Mr. Hamilton, 'Do you know where Mr. Bowman is? Go find him.' He went upstairs in the building, the offices of Gum, Incorporated, and came downstairs and told me that Mr. Bowman was upstairs behind a locked door. I said, 'Get Hiester.' Hiester came in and I said, 'Go up and see if you can get Bowman to come down here. I want to discuss this case with him like business men.' We couldn't get Mr. Bowman to come down."

[6] See section 407 of the Business Corporation Law of 1933, P. L. 364.

electing three directors. The action of the board and that of the stockholders, in the respects indicated, will, for purposes of reviewing this record, be accepted: *Barber v. Horstman,* 295 Pa. 253, 145 A. 133.

The evidence received at the preliminary hearing does not sustain the averment of conspiracy made in the bill on which the prayer for the appointment of a temporary receiver was based and granted; indeed, as to one of the defendant directors, against whom particular charges of conspiracy were made, the plaintiff specifically stated at the trial that he was satisfied that this defendant had acted in good faith. The bill makes no pretense of stating a case within the Business Corporation Law of 1933, P. L. 364, sections 1101 et seq. After this appeal was taken, the plaintiff filed a petition in this court for leave to amend the bill by adding a number of averments, some of them specifically designed to bring the case within provisions of the Business Corporation Law; as the proposed amendment would have resulted in such radical departure from what the defendants had been asked to meet and, in fact, had met in the first instance, we could not allow the amendment.

The Business Corporation Law is, in part, a declaration and codification of, and, in part, a supplement to, the prior law on the subject. The equitable jurisdiction over corporations in this Commonwealth depends largely upon statute, the scope of which was referred to in *Whyte v. Faust,* 281 Pa. 444, 447, 127 A. 234. Principles governing the consideration of bills for the appointment of receivers, prior to the Business Corporation Law, were dealt with in a number of cases,[7] the most

---

[7] Among them, see *Franklin Nat. Bank v. Kennerly Coal & Coke Co.,* 300 Pa. 479, 150 A. 902; *Hall v. City Park Brewing Co.,* 294 Pa. 127, 143 A. 582; *Hlawati v. Maeder-Hlawati Co.,* 289 Pa. 233, 137 A. 235; *Cunliffe v. Consumers' Assn.,* 280 Pa. 263, 124 A. 501; *Gilmore v. Gilmore Drug Co.,* 279 Pa. 193, 123 A. 730; *Schipper Bros. Coal Mining Co. v. Economy Coal Co.,* 277 Pa. 356, 121 A. 193.

important of which is *McDougal v. Huntingdon & B. T. Mt. R. R.*, 294 Pa. 108, 143 A. 574, and the most recent, *Schuster v. Largman,* 308 Pa. 520, 162 A. 305. Sections 1107 and following sections of the statute deal with involuntary proceedings for winding up and dissolution. No prior statute specifically provided for the involuntary winding up of a solvent business corporation. Without attempting, by what is now said, to limit the action of the parties, or of the learned court below, on the return of the record, if leave to make appropriate amendments to the pleadings is asked by either party, it is to be noted that section 1107 vests the common pleas with power, on the petition of the shareholder, inter alia, to "entertain proceedings for the involuntary winding up and dissolution of the corporation, when it is made to appear. . . . That the directors are deadlocked in the management of the corporate affairs and the shareholders are unable to break the deadlock, and that irreparable injury to the corporation is being suffered or is threatened by reason thereof." Section 1108 provides that in the course of such a proceeding the court may appoint a receiver pendente lite, and, after hearing, may appoint a liquidating receiver. Under section 1109, when it appears "that the deadlock in the corporate affairs has been broken or the management or control of the corporation has been changed, the court, in its discretion, may dismiss the proceeding and direct the receiver to redeliver to the corporation all its remaining property and assets."

While the evidence is not sufficient to support the averments of unlawful conspiracy made by the plaintiff, it would seem to disclose a case within the terms of the statute. The Act of March 21, 1806, 4 Sm. L. 326, section 13, providing that "in all cases where a remedy is provided or duty enjoined, or any thing directed to be done by any act or acts of Assembly of this Commonwealth, the directions of the said acts, shall be strictly pursued, and no penalty shall be inflicted or any thing

done agreeably to the provisions of the common law, in such cases, further than shall be necessary for carrying such act or acts into effect" has been construed to require resort to the statutory remedy provided for any particular case: *Taylor v. Moore*, 303 Pa. 469, 154 A. 799; *Baur v. Wilkes-Barre Light Co.*, 259 Pa. 117, 102 A. 430; *Fogelsville, etc., Elec. Co. v. Pa. Power & Light Co.*, 271 Pa. 237, 114 A. 822. Whatever advantage was obtained by either interest over the other (e. g., plaintiff's removal from the presidency or the removal of the directors and the reëlection of a new board) was legally obtainable pursuant to the by-laws which both interests had agreed should control their relations[8]: *Barber v. Horstman*, 295 Pa. 253, 145 A. 133, supra. They were acting within the terms of the relationship they had established for themselves.

The record does not support a finding of fraudulent conduct on the part of defendants or of mismanagement of the business of Gum. It does appear that plaintiff, who, as president of Gum, was in executive charge of its business, became dissatisfied with the base supplied by Sweet under the contract referred to and that Sweet gave inadequate consideration to plaintiff's complaint at the end of 1935, save as the price was reduced, if we correctly understand the evidence, to 34 cents a pound. On the other hand, Sweet was within its rights in continuing to call for payment of Gum's demand note and other accounts due it. There is no evidence of agreement that the debt should not be paid as specified in the note. But (apart now from the Business Corporation Law) in the absence of fraud, mismanagement of the corporate property, or like wrongful conduct, equity will not, at the instance of a stockholder appoint a temporary receiver

---

[8] See also *Schuster v. Largman*, 308 Pa. 520 (1932), 162 A. 305, where a receiver was refused on a minority stockholder's bill, notwithstanding dissension among the stockholders which resulted in his removal from an executive position.

for a solvent corporation: *Hlawati v. Maeder-Hlawati Co.,* 289 Pa. 233, 137 A. 235, supra. Here there is no evidence of fraud, mismanagement or wrongful conduct. There is no evidence that, as now managed, the corporation may not do as well as it did under Mr. Bowman's presidency. A temporary receiver may not be appointed for a solvent corporation on the mere conjecture of a stockholding interest (even if it represents one-half the shares) that the other half may not succeed. Save as authorized by the Business Corporation Law, equity has no power to order the involuntary dissolution of such a corporation. It is, of course, a laudable hope, as was said below, that if a temporary receiver is appointed, quarreling interests will compose their differences; they may, or they may not; in this case they did not.[9] Each interest chose to stand on its legal rights. But that fact, on the averments of the bill and the evidence, did not authorize the court to take the property from the management and control of the owners and turn the management over to a receiver; prima facie, neither party had violated any law when the temporary receiver was appointed. "Receivers are appointed only in aid of some recognized, presently existing legal right, and will not be appointed where receivership is the sole relief asked": *McDougal v. Huntingdon & B. T. Mt. R. R.,* 294 Pa. 108, 117, 143 A. 574, supra.

The pleadings determine the relief that may be afforded: "Neither allegations without proof nor proof without allegations, nor allegations and proof which do not substantially correspond, will entitle complainant to relief, unless the defect be remedied by amendment": *Spangler Brewing Co. v. McHenry,* 242 Pa. 522, 528, 89 A. 665. The bill did not ask for the dissolution of the corporation and the application of its property to the

---

[9] The learned president judge of the court below said: ". . . the only advantage of placing it in the hands of some outsider is to make them adjust their differences."

payment of its debts and to its stockholders. Mere dissension is insufficient, and in substance nothing more has been shown. There is evidence that each interest expressed a willingness and ability to buy out the other and that each refused to sell. Relief in such circumstances is under the provisions of the Business Corporation Law, a fact which makes it unnecessary to consider decisions from other states dealing with the general powers of courts of equity as there administered.

The decree is reversed and the record is remitted for further proceedings, costs to abide the final decree.