## Garrett v. George K. Garrett Co., Inc., et al.

*Leighton P. Stradley*, for plaintiff.
*Earl Jay Gratz*, for defendants.

GORDON, JR., P. J., February 6, 1940.—This case, which is before us upon bill, answer and proofs, is a bill in equity brought by Katherine G. Garrett, treasurer and owner of 50 percent of the stock of the George K. Garrett Company, Inc., one of the defendants, against the corporation and Abraham G. Borowsky, president, and F. Gordon Borowsky, vice president and secretary of the corporation, and also individually and as copartners, doing business under the name of A. G. Borowsky &. Co., and Rae Borowsky, titleholder for A. G. Borowsky of the remaining 50 percent of the company's stock. The general purpose of the bill is to secure a declaration of the true terms of an oral agreement between plaintiff and A. G. Borowsky, under which the latter acquired ownership of the remaining 50 percent of the company's stock and undertook control of its management, and to secure an adjudication of the rights of the parties in respect thereto. The specific relief sought is for a decree: First, declaring terminated a certain sales agency agreement between defendant company and the copartnership (A. G. Borowsky & Co.) under which the product of the company has been marketed for many years; second, restraining further payments to the copartnership under said agreement, and directing restitution to the company of certain alleged excessive payments heretofore made thereunder; third, directing execution by the company's officials of a licensing agreement with plaintiff for certain patent rights inherited by her from her father; and fourth, removing A. G. Borowsky and F. Gordon Borowsky, the individual defendants, as officers and directors of the company.

The George K. Garrett Company is a corporation engaged in the business of manufacturing lock-washers used extensively in the automobile and other industries under patents owned by plaintiff's father, George K. Garrett, who, until his death in 1937, was its president and principal stockholder. The company was a closed corporation, Mr. Garrett and his brothers being the owners of

all its outstanding stock, and its active control and management being in the hands of Mr. Garrett. On the latter's death, plaintiff inherited her father's interest in the company, and thus became the principal stockholder and owner of almost 50 percent of its total authorized capital, the remaining outstanding stock being owned, as already indicated, by her uncles. The company was at that time in serious financial difficulty. It had been losing money, and was practically in an insolvent condition, its principal creditors being the A. G. Borowsky Company and the Pittsburgh Steel Company, owing to the latter upwards of $42,000. It maintained no selling organization, and since 1934 had been marketing its products through A. G. Borowsky Co. under an exclusive selling agency contract, which had been negotiated by plaintiff's father and which was, by its terms, automatically continued from year to year until terminated by three months' notice from one of the parties to it. The patents under which the company was operating were owned by Mr. Garrett and, as it was practically a personal business, they had neither been formally assigned to the company, nor had any licensing agreement been entered into between it and Mr. Garrett for the use of the patents. On Mr. Garrett's death, therefore, the ownership of the patents passed to plaintiff, together with her father's stock interest in the company.

[The court here proceeded to point out that, although the Garrett Company was in a desperate financial condition, its patents appeared to have inherent value; that, upon her father's death, plaintiff, apparently feeling herself incompetent alone to extricate the company from its difficulties, sought the aid of Mr. Borowsky; and that as a result of negotiations with him an oral contract was made, the terms of which were a subject of dispute, but which, from the testimony, the court found to be as follows:]

The parties were to own an equal interest in the company, Mr. Borowsky to acquire his share by purchasing

from her uncles the stock owned by them, and from the company a sufficient number of authorized and unissued shares to complete his 50 percent ownership. Plaintiff, on her part, was to complete her half ownership by purchasing the remaining company shares. As plaintiff did not have the money necessary to carry out her part of the agreement, plaintiff's purchase was actually effected by Borowsky lending the necessary money to her (some $4,200) upon the understanding that the advance was to be repaid only out of any future dividends that might be declared by the company. The directorate of the company was to be composed of Mr. Borowsky, his son, F. Gordon Borowsky, and plaintiff. Mr. Borowsky was to become president, his son, F. Gordon Borowsky, vice president and secretary, and plaintiff, treasurer of the company. There was no definite agreement respecting the salary of the elder Borowsky, as he was not expected to devote his time exclusively to the business of the company. As to plaintiff's salary as treasurer, however, it was definitely agreed, as part of the consideration for the use of the patents by the company, that her employment in that capacity should be permanent during such use, and that her salary should not be less than $100 per week, and might be increased as the affairs of the company warranted it to $200 per week.

With respect to the patents, plaintiff was to license their exclusive use to the company during their lifetime, as a consideration for which she was to receive $5,200 in cash as soon as the money became available, and in addition, be employed as treasurer during the continued use of the patents by the company upon the salary terms stated above.

[The court here further discussed the negotiations leading up to the oral contract, the conflicting claims as to its contents, and the reasons for finding its terms to have been as previously outlined. It further found that plaintiff had not been coerced and overreached by the defendants in entering into the contract. It then pointed

out that the affairs of the company had apparently been managed without undue friction between the parties from its reorganization to the end of 1937, when plaintiff, being unable by mere demand to bring about a readjustment of her stockholdings and recognition of the new position taken by her, resorted to various annoying methods to force compliance with her demands, including the rendering of a secret financial statement of the company's affairs to its principal creditor.]

This brings us to a consideration of that part of the case which relates to the agency agreement which the Borowsky partnership has with the company. As we have already stated, that agreement was originally made in 1934 when plaintiff's father was living, and provides for a 10 percent commission to the partnership on all sales made by it. It is a yearly agreement running from March 18th of each year unless terminated by three months' notice before the end of any renewal period. The status of the agency agreement does not appear to have been directly involved in the reorganization of the company, and it therefore continued in operation. Without consulting her fellow-directors and officers, Mrs. Garrett, as treasurer of the company, sent to the partnership, in the middle of December 1937, a formal notice that the sales agreement would be terminated on the 18th of the following March, and made demand upon the partnership to negotiate with her a new sales agency agreement. This action was unauthorized by the board of directors, and, of course, was taken without the knowledge or consent of defendants. The position taken by plaintiff respecting it is that it was unnecessary for her to secure authority from the board of directors to rescind the agreement, because all the other officers and directors, being members of the partnership, could not lawfully vote on corporate matters in which they had a personal and antagonistic interest, and hence she, as the only remaining officer and member of the board who could act in the matter, had the right to terminate the contract at her

pleasure and without consulting defendants, especially as there had been no regular meetings of the stockholders and the board since the reorganization of the company. Shortly before March 18th, plaintiff again wrote to the Borowsky partnership, calling their attention to the approaching termination of the agreement, asserting that the commissions being paid were exorbitant and unreasonable, and demanding that a new agreement tendered by her be entered into. Defendant Borowsky, being in control of the management of the business, apparently paid no attention to this communication, and continued to sell through his partnership, and to pay commissions under the existing sales agreement. The bill prays for a declaration of the termination of the agency agreement and for an accounting for, and restitution of, alleged exorbitant and unlawful payments made under it.

No competent evidence was presented to establish that the terms of the existing agreement are exorbitant and unconscionable, and in this respect plaintiff's contention is completely unsupported by the evidence. Nor is there anything in the agreement itself to justify the broad assertion that it is unconscionable and oppressive in its terms. It was made by plaintiff's father when the Borowsky partnership had no interest in the company, and was apparently satisfactory to him, for it continued during his lifetime. The 10 percent paid under it on gross sales does not represent profit to the partnership, for the entire cost of marketing the products is borne by the partnership, and there is nothing to indicate that to establish and maintain a selling department in its own organization would not be more costly to the Garrett Company than to continue under the present arrangement. We cannot, therefore, condemn the mere continuance of the sales agreement as in itself improvident and unwise.

We think, however, that plaintiff's contention that she had the power alone to terminate the selling agency contract on behalf of the company, because of Mr. Borowsky's personal interest in it, is better taken. His posi-

tion in the company, which practically enables him alone to decide whether its contract with himself is fair and its continuance desirable in the best interests of the company, is unwholesome and against equitable principles of fair dealing; and, in ordinary circumstances, we would not hesitate to declare the contract terminated by the notice sent to the partnership by plaintiff, or at least to require its continuance to be submitted to a vote of stockholders. The difficulty in doing so, however, lies in the fact that unless the parties themselves, who are the only stockholders, amicably settle this question between them, a stockholders' meeting, in which their absolute parity in voting strength would settle nothing, would be a fruitless gesture. On the other hand, we have neither the power to write a new contract for them, nor to decide the best manner of marketing the company's products. To restrain a continuance of the present agreement would only accentuate the existing deadlock in management, and precipitate a further crisis in the company's affairs, which obviously would be against the best interests of all. The ordinary method of overcoming such an impasse in a corporation by directing that the matter in dispute be referred to the stockholders, who could break the deadlock in the management and elect officers who would act more harmoniously in the interests of the company, is manifestly not available here, and a court of equity may withhold a remedy it would ordinarily grant if to do so would be ineffective and tend to do more harm than good.

The parties have only themselves to blame for their present position. They dealt at arm's length, without fraud or coercion on the part of either, and erected a corporate structure that they should have realized might produce the very difficulties that have arisen, if serious disagreements in management should develop. Plaintiff must have known, in voting for the existing corporate set-up, that she was placing control of the company's affairs in the hands of defendants. We have no doubt that, in the dilemma then confronting her, she intended to do

exactly that, and it is altogether probable that defendant Borowsky would not have come to her aid and risked a substantial investment in the company had he not been given such control. Although they probably expected to work together in harmony, they should have realized that the equal division of stock ownership would prevent a change in control by ordinary corporate processes, and plaintiff's failure to anticipate the bitter disagreements that have developed between them gives us no authority to deprive defendants of the advantages of their bargain in the absence of clear proof that it was procured by their own misconduct.

The difficulty created by their want of foresight and judgment must be solved by the parties themselves. We have no power to alter their deliberately-formed agreement in order to favor one over the other by vesting the voting control in either. Neither have we the power, nor would we be inclined, to assume the responsibility of constantly managing the company's affairs in the capacity of a sort of perpetual arbitrator of the many disputes that will inevitably arise between them in the future. Yet, to merely declare the sales agency agreement terminated would only invite the undesirable consequences which would inevitably follow their inability to agree on some other method of marketing the company's output. In this situation, we can see but one practical solution of the present difficulty, which we are convinced should not yet be resorted to, namely, a receivership and liquidation of the company. If we look through the corporate forms under which it is operating, it is evident that the real nature of this business relationship is one of partnership rather than of a corporate entity. Although operating under corporate forms, it is in reality a copartnership in which each partner has equal rights and duties. Being unable to agree, their only recourse is, like that of any partnership, to a dissolution of the relationship, for courts of equity will not embark upon the management of enterprises merely to save partners from the consequences of

their own unwillingness to accommodate their rights and interests for their mutual advantage. The power of courts of equity to appoint receivers in proper cases, even for solvent corporations, is well recognized: Cunliffe et al. v. Consumers Association of America et al., 280 Pa. 263; Schmitz et al. v. The Metallic Condense Co. et al. (No. 1), 11 Dist. R. 442. This power, however, should be exercised with the utmost caution, and only as a last resort: Hlawati v. Maeder-Hlawati Co. et al., 289 Pa. 233; Bowman v. Gum, Inc., et al., 321 Pa. 516. See also McDougall et al. v. Huntingdon & Broad Top R. & C. Co., 294 Pa. 108.

We are loath to apply so drastic a remedy at the present time in this case, for the company's affairs appear on the whole to have been well managed by Mr. Borowsky. Its principal indebtedness has been greatly reduced, and it has been made to produce a substantial income for both parties to the litigation. Its solvent condition justifies the belief that, if managed in harmony, it could be developed into a still more valuable and lucrative business. To destroy such an asset by dissolution of the corporation would be most unfortunate, yet that it will be ultimately ruined by a continuance of the present disagreements of its owners seems to be inevitable. We are not, therefore, inclined to appoint a receiver for the company immediately. The parties can, and should, reconcile their differences by the exercise of good judgment and a coöperative spirit, and to this end, we will refuse the relief asked for by plaintiff, and dismiss the bill without prejudice to either party, if it hereafter appears that their inability to agree is preventing the company from functioning and dissipating its resources, to make application for the appointment of a receiver to liquidate its assets.

Accordingly, we enter the following

*Decree nisi*

And now, to wit, February 6, 1940, this case having come on to be heard upon bill, answer and proofs, upon

consideration thereof, it is ordered, adjudged, and decreed:

1. The relief prayed for is refused;

2. The bill is dismissed without prejudice to the parties to reopen the case hereafter by application for the appointment of a receiver on proper proof that such action is required;

3. Each party shall bear his own costs in this proceeding.