424 A.2d 881

**Philip D. CERAMI and L. Thomas Jones, Appellants,**

**v.**

**Albert J. DIGNAZIO, Mario Eufrasio, Samuel Idone and BEDI, Inc.**

**Philip D. CERAMI and L. Thomas Jones**

**v.**

**Albert J. DIGNAZIO, Mario Eufrasio, Samuel Idone and BEDI, Inc., Appellants.**

Superior Court of Pennsylvania.

Argued March 22, 1979.

Filed Dec. 19, 1980.

Petition for Allowance of Appeal Denied March 23, 1981.

428

Howard D. Scher, Philadelphia, for Cerami and Jones.

Garland D. Cherry, Media, submitted a brief on behalf of Dignazio et al.

Michael P. Dignazio, Media, submitted a brief on behalf of BEDI.

Before CERCONE, President Judge, and WATKINS and HOFFMAN, JJ.

CERCONE, President Judge:

This case involves cross appeals taken from two final decrees entered in an equity action instituted by plaintiffs to establish their status and rights in the corporate defendant; and the alleged obligations of the individual defendants. The events giving rise to the respective appeals are as follows:

## I. *Plaintiffs' Appeal*

After defendants responded to plaintiffs' complaint with, among other things, a counterclaim, pursuant to Pa.R.C.P. 213(b), the chancellor ordered a separate trial limited to the issues of plaintiffs' right to ownership of shares of BEDI, Inc., and plaintiffs' right to manage the business of BEDI. Plaintiffs contend that the chancellor committed several errors in adjudicating these two issues. We disagree.

The record discloses that BEDI is a Pennsylvania corporation organized by defendants in 1968 to engage in the operation of a car wash/gas station known as "Shorty's." As of August 1969, BEDI had issued 50 of its 100 authorized shares to the three individual defendants: Dignazio—25 shares, Eufrasio—12½ shares, and Idone—12½ shares. In the fall of 1969, plaintiffs orally agreed to purchase the remaining unissued 50 shares of BEDI for $70,000. This oral agreement was subsequently finalized by a written shareholders subscription agreement dated January 15, 1970, which required plaintiffs to pay $15,000.00 on the signing of the contract and the balance of $55,000.00 over a seven year period in monthly installments of $913.10. The subscription agreement provided that the 50 shares being purchased by plaintiffs would be placed in escrow and not delivered to them until they had made payment in full in accordance with the agreement.

At the time the agreement was executed, BEDI's only debt was a $70,000.00 note held by Southeast National Bank which was to be paid in monthly installments of $1,162.10. The chancellor found that the individual defendants had assumed the obligation of paying off a $15,000.00 portion of the $70,000.00 note by making monthly payments to BEDI in the amount of $249.00.[1] Both plaintiffs and defendants made their monthly payments to BEDI until July 1970, after which no further payments were made by any of the parties.

---

1. Thus, the combination of plaintiffs' $913.10 monthly payment and the defendants' $249.00 monthly payment equalled BEDI's monthly installment payment on the bank note.

In the spring of 1970, BEDI obtained from its supplier a discount of two cents per gallon from the regular tank wagon price of gasoline. This discount resulted in an additional monthly profit to BEDI of approximately $1,200.00. The chancellor found that in light of this increased income, the parties agreed that this additional profit would be used to make the monthly payments on the bank note and the parties would accordingly discontinue their monthly payments to BEDI.

In August of 1972 the parties orally agreed that plaintiffs would assume the management of "Shorty's." [2] The chancellor found that it was agreed that plaintiffs, as compensation for their management services, would receive 10% of the net profit on gasoline sales only. At approximately the same time, the parties agreed to equalize the share ownership in BEDI by redistributing their shares. Accordingly, plaintiffs agreed to transfer five of their shares to defendant Idone, and five to defendant Eufrasio; and defendant Dignazio agreed to transfer two and one-half shares to both Eufrasio and Idone. As a result of this redistribution, each stockholder in BEDI was to hold twenty shares.

In May of 1974, the parties met to discuss certain problems that had arisen.[3] These problems were not resolved and good will between the parties steadily declined. On December 30, 1974, at a special corporate meeting attended by all parties, a resolution was adopted removing plaintiffs as managers, officers, and directors of BEDI. Shortly thereafter, plaintiffs filed the instant action.

As previously noted, the chancellor ordered the trial of the cases separated so that the first hearing or trial would be confined to the issues of plaintiffs' right to ownership of

2. From the time the car wash/gas station opened in late 1969 until September 1972, it was under the management of defendant Dignazio or another individual not a party to this case.

3. Plaintiffs wanted their management contract reduced to writing; defendants wanted plaintiffs, who were officers and directors in another corporation known as JAVC, Inc., to issue them stock in that corporation; and all parties were desirous of effectuating the stock redistribution agreement they had reached in August 1972.

shares in BEDI, and of plaintiffs' right to manage BEDI. Following a hearing, the parties submitted proposed findings of fact and conclusions of law. Thereafter, the chancellor filed an adjudication and decree nisi concluding, inter alia, that plaintiffs were the legal owner of 40 shares of stock in BEDI subject to any corporate indebtedness that had been incurred; and that the plaintiffs' right to manage BEDI was terminated on December 30, 1974. Plaintiffs' exceptions were dismissed and the decree nisi was made final by the court en banc.[4]

"At the outset, we note that our scope of review is narrowly drawn. Ordinarily, the findings of a chancellor, affirmed by the court en banc, have the effect of a jury verdict and will not be reversed unless a review of the record reveals that they are unsupported by the evidence or predicated upon erroneous inferences and deductions or errors of law. The chancellor has seen and heard the witnesses; if a reading of the record reasonably can be said to yield the conclusions which he has drawn, we may not substitute our judgment for his." *Payne v. Kassab*, 468 Pa. 226, 234, 361 A.2d 263, 267 (1976) (citations omitted).

In this appeal, plaintiffs raise five separate arguments in support of their exceptions to the chancellor's findings and conclusions. Plaintiffs first contend they were denied due process when the chancellor decided issues which are alleged to have been beyond the contemplated scope of the first hearing. That is, plaintiffs assert that since the chancellor directed that the first hearing be limited to the issues of plaintiffs' right to ownership of shares in BEDI and right to manage BEDI, it was error for the chancellor also to decide at this hearing that plaintiffs were not relieved of their obligation to pay for the stock, and to determine the terms of their management fee. Plaintiffs' position is untenable.

Whatever rights of ownership in BEDI stock plaintiffs may have acquired necessarily arose from the shareholders

4. No exceptions were filed by defendants.

subscription agreement they entered into on January 15, 1970. That agreement, as previously noted, provided, *inter alia*, that plaintiffs' stock would be placed in escrow and not delivered to them until their 84 monthly installment payments had been satisfied in full. The agreement further provided that in the event of default by plaintiffs, BEDI could either cancel plaintiffs' subscription and retain any prior payments as liquidated damages; or, at its option, enforce the agreement and demand payment of the balance of the full purchase price. The evidence clearly established that plaintiffs had made only 7 payments; i. e., January 1970 through July 1970. Plaintiffs, however, maintained that in July 1970, the parties mutually agreed that they would be relieved or forgiven from making any further payments. Defendants, on the other hand, denied any such agreement and contended that plaintiffs were in default. Thus, the chancellor necessarily had to resolve this factual issue of forgiveness or default before he could reach any conclusion as to plaintiffs' right to ownership. In other words, if plaintiffs had been relieved of the obligation to pay in full they would obviously be entitled to the stock as provided in the subscription agreement. Default on their part, however, could have resulted in a cancellation of their subscription rights. In short, forgiveness or default was the crux of the case at the first hearings with respect to the issue of plaintiffs' right to ownership of BEDI stock.[5]

Moreover, plaintiffs' claim that they were denied due process because they were not prepared to litigate the question of forgiveness or default is belied by the record. In the first place, plaintiffs presented testimony in support of their position that defendants excused them from making further payments for the purchase of the stock. In addition, plaintiffs' first requested finding of fact filed prior to the initial adjudication, asked the chancellor to find that they had been relieved of their obligation to make monthly pay-

5. As will be discussed later, the chancellor concluded that the obligation to make full and complete payments had neither been breached nor forgiven, but rather mutually postponed to a later date.

ments. On this record, plaintiffs' plea of surprise must be rejected.

■ Contrary to plaintiffs' contention the chancellor did not err in determining the terms of their management fee at the first hearing. Once again, plaintiffs not only offered extensive testimony on the terms of their management fee, but also requested the chancellor to make a finding (albeit in their favor) on the specific terms of their management contract. In sum, both the record and logic refute plaintiffs' first contention that the chancellor rendered findings and conclusions beyond the scope of the first hearing.

Plaintiffs ask us to find that the chancellor's findings regarding the terms of their management fees and their obligations under the subscription agreement are not supported by the evidence. The chancellor found that in August of 1972 the parties orally agreed that plaintiffs would assume management of the business "for which they would receive, as compensation for their services, 10% of the gross sales of gasoline, less its tank wagon cost. . . ." (Findings of Fact, No. 19). Plaintiffs, on the other hand, assert that their management fee was to be computed on the basis of "10% of the gross sales of gasoline, oil and carwashes less the *net cost* of gasoline." The difference between the two formulas is substantial.[6]

With respect to their obligations under the subscription agreement, plaintiffs, as previously discussed, contended that their obligation to continue making payments had been discharged by oral agreement of the parties in July of 1970, when BEDI secured a lower price on gasoline from its supplier resulting in sufficient additional profits to enable the corporation to assume the monthly payments on the bank note.

6.  The tank wagon cost is the price the retailer pays the supplier without taking into account any competitive allowance or fee which the supplier pays to the retailer. The net cost takes into consideration this competitive allowance or bonus. Moreover, the management fee urged by plaintiffs was to be computed on the basis of 10% of the gross receipts from all sales and not just that of gasoline.

■ Most of the evidence as to whether there was a novation in July of 1970 which excused plaintiffs from making further payments under the subscription agreement was in the form of oral testimony, as was the evidence pertaining to the terms of plaintiffs' compensation under the management contract. Plaintiffs complain that the chancellor's determinations relative to these issues rests upon the defendants' self-serving testimony. However, the major basis for challenging that testimony is plaintiffs' own equally self-serving testimony. In circumstances such as these, "[w]here credibility of the witnesses is important, the chancellor's findings are entitled to particular weight because of the opportunity which was his to observe the demeanor of witnesses on the stand." *Brentwater Homes, Inc. v. Weibley*, 471 Pa. 17, 21, 369 A.2d 1172, 1174 (1977). After reviewing the voluminous record in this case, there is no doubt but that the chancellor's findings were more than adequately supported by the evidence.

Plaintiffs' theory that a novation was entered into in July 1970, only seven months after execution of the written subscription agreement, was totally inconsistent with their position prior to trial. Various pretrial pleadings and documents filed on plaintiffs' behalf reveal that they repeatedly maintained that they were relieved of their indebtedness to BEDI in August 1972, as opposed to July 1970. Moreover, a letter dated April 17, 1971 from plaintiffs' accountant, states that their financial condition had not changed from the one reflected in the financial statement they submitted to the Southeast National Bank in October 1970. That original financial statement acknowledged the existence of plaintiffs' monthly subscription obligation to BEDI. In light of these contradictions, it is apparent that plaintiffs failed to present adequate evidence to support their position that their obligation under the subscription agreement had been discharged by oral agreement in July 1970. See *Pellegrene v. Luther*, 403 Pa. 212, 169 A.2d 298 (1961), and cases cited therein.

As far as the chancellor's finding regarding the terms of plaintiffs' management fees is concerned, suffice to say that this issue turned on credibility. The management contract was never reduced to writing and the parties' positions as to what they had orally agreed upon were, as aptly stated by the chancellor, "diametrically opposed." The chancellor was of the opinion that the credible evidence supported defendants' position and that conclusion was affirmed by the court en banc. Plaintiffs have not persuaded us that there is any justification for disturbing those findings. *Craft Reupholstering Co. v. Rosenberg*, 420 Pa. 43, 216 A.2d 49 (1966).

■ Plaintiffs argue that the chancellor erred, as a matter of law, in concluding that defendants were not estopped from challenging the amount of the management fees which plaintiffs withdrew from the corporation. In other words, it is contended because defendants never objected during the period that plaintiffs were withdrawing their management fees on the basis of 10% of gross sales less the net cost of gasoline, the principle of equitable estoppel precludes defendants from subsequently disputing the amount of those fees. We disagree. In *Northwestern Nat'l Bank v. Commonwealth*, 345 Pa. 192, 196–97, 27 A.2d 20 (1942) quoted in *Tallarico Estate*, 425 Pa. 280, 288–9, 228 A.2d 736 (1967) the Court pertinently observed: "Equitable estoppel arises when one by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts. In this situation, the person inducing the belief in the existence of a certain state of facts is estopped to deny that the state of facts does in truth exist, aver a different or contrary state of facts as existing at the same time, or deny or repudiate his acts, conduct, or statements."

"The following principles must be considered in applying the doctrine of equitable estoppel: '. . . . in the absence of expressly proved fraud, there can be no estoppel based on

the acts or conduct of the party sought to be estopped, where they are as consistent with honest purpose and with absence of negligence as with their opposites.' [citing no authority]. 'There can be no equitable estoppel where the complainant's act appears to be rather the result of his own will or judgment than the product of what defendant did or represented. The act must be induced by, and be the immediate and proximate result of, the conduct or representation, which must be such as the party claiming the estoppel had a right to rely on. The representation or conduct must of itself have been sufficient to warrant the action of the party claiming the estoppel. If notwithstanding such representation or conduct he was still obliged to inquire for the existence of other facts and to rely on them also to sustain the course of action adopted, he cannot claim that the conduct of the other party was the cause of his action and no estoppel will arise.' [citing authority]. 'Where there is no concealment, misrepresentation, or other inequitable conduct by the other party, a party may not properly claim that an estoppel arises in his favor from his own omission or mistake.': [citing authority]. 'Estoppel cannot be predicated on errors of judgment by person asking its benefit.' [citing authorities]."

Instantly, as the chancellor so found, there was no representation or conduct by defendants on which plaintiffs relied. Rather, it appears that plaintiffs' decision to compute their management fees on the basis of 10% of gross sales less the net cost of gasoline, was the product of their own will or mistake in judgment. The record simply does not support a charge of inequitable conduct on defendants' part. As the chancellor aptly observed: "[N]o inequitable consequences resulted to plaintiffs from their reliance on anything the defendants did or said. On the contrary, the inequitable consequences resulting from plaintiffs' action were to the contrary. For them to claim 10% of gross income without deducting operating expenses and costs of goods (other than gasoline) would be most inequitable to defendants."

438

■ The principle of equitable estoppel is invoked to prevent a fraud, not to perpetrate one. *Korpa v. Stuyvesant Life Ins. Co.,* 236 Pa.Super. 581, 351 A.2d 682 (1975); *Norman v. World Wide Distributors, Inc.,* 202 Pa.Super. 53, 195 A.2d 115 (1963). Here, if any misrepresentation or fraud existed, it was committed by plaintiffs and not defendants. Plaintiffs plainly failed to carry their burden of establishing an estoppel by clear, precise and unequivocal evidence. See *Blofsen v. Cutaiar,* 460 Pa. 411, 333 A.2d 841 (1975).

■ Plaintiffs are desirous of having this court find that the chancellor abused his discretion in ordering them to account for the funds involved in the corporation's tire and antifreeze operation. The chancellor found that during the period plaintiffs were the exclusive managers of BEDI and they expended $27,795.06 for the purchase of tires and antifreeze, but accounted for sales of only $17,669.46 with no remaining inventory when they were removed as managers. Plaintiffs offered no explanation for the discrepancy other than to claim that they were not the party responsible for this aspect of the business. As the court en banc stated in dismissing plaintiffs' exception in this regard: "Plaintiffs argue that because the on-site manager at the time was Mario Dignazio, a son of one of the individual defendants, he and not they should account for the deficit. This is not persuasive. Plaintiffs had the authority over the business and its personnel, controlled all books of account and were the ones responsible for the operation, not the employee, Mario Dignazio. The chancellor has ordered an accounting of this deficit, and has given to plaintiffs and their accountant the right of inspection and discovery of all books of the company. We find no error or unfairness in this action of the chancellor placing this responsibility on plaintiffs."

■ The final contention advanced in plaintiffs' appeal is the allegation that the chancellor erred in declining to appoint a receiver for the dissolution of BEDI. At the outset, it would appear that this issue has been rendered moot by the voluntary dissolution of BEDI subsequent to the proceedings in the court below. In any event, it is

abundantly clear that plaintiffs fell far short of establishing the requisite circumstances to justify the appointment of a receiver. It is well-settled that dissolution of a solvent corporation is a drastic measure to be invoked only in extreme circumstances. See *Tate v. Philadelphia Transp. Co.,* 410 Pa. 490, 190 A.2d 316 (1963). In the absence of a clear abuse of discretion or error of law, the chancellor's decision will not be disturbed on appeal. *McDougall v. Huntingdon & Broad Top Mountain R. R. & Coal Co.,* 294 Pa. 108, 143 A. 574 (1928); *Tate v. Philadelphia Transportation Co., supra; Bogosian v. Foerderer Tract Comm.,* 264 Pa.Super. 83, 399 A.2d 408 (1979). "Receivers will not be appointed unless the chancellor is convinced the right is free from doubt, the loss irreparable, with no adequate legal remedy, and the relief sought is necessary." *McDougall v. Huntingdon & Br. T. R. etc. Co.,* 294 Pa. at 117 (citations omitted). See *Tate, supra; Bogosian, supra.*

Plaintiffs allege they were entitled to appointment of a receiver on the grounds that the defendants were wasting the corporate assets and there was likely to be future dissension among the stockholders and directors. The chancellor, however, found no evidence of wasting or misapplication of the corporation's assets; and plaintiffs have utterly failed to direct our attention to any evidence to the contrary. Moreover, dissension in and of itself, let alone the possibility of dissension, is not adequate grounds for the appointment of a receiver. *McDougall v. Huntingdon & Br. T. R. etc. Co., supra; Bowman v. Gum, Inc.,* 321 Pa. 516, 184 A. 258 (1936). In sum, the chancellor acted well within his discretion in finding no cause to appoint a receiver.

## II. *Defendants' Appeal*

This appeal pertains to the second or final adjudication rendered by the chancellor. As earlier noted, pursuant to Pa.R.C.P. 213(b) the chancellor ordered that certain fundamental issues in the case be tried separately. The purpose of the second or final adjudication was to determine the amount, if any, of plaintiffs' indebtedness to BEDI.

In support of their exceptions to the chancellor's final adjudication, defendants raise three arguments. It is first contended that the chancellor erred in finding that the individual defendants were indebted to BEDI for the sum of $15,000.00 plus interest. Defendants assert that such a finding is in contravention of the parol evidence rule and unsupported by the record. We must disagree.

Defendants' position is predicated on the premise that the chancellor's finding was either based on a prior oral understanding between the parties which was not incorporated into the written subscription agreement, or a subsequent oral modification of that subscription agreement. Thus, it is argued that the parol evidence rule was violated in considering the alleged prior oral agreement or, alternatively, the record is devoid of sufficient evidence to support a subsequent oral promise to modify the terms of the subscription agreement. However, the record reveals that neither theory was the basis for the chancellor's finding. The court en banc amended the chancellor's final adjudication to include the following additional finding of fact:

"44. On or about December 16, 1969 Albert Dignazio accepted a check in the sum of $15,000.00 from Philip Cerami intended for the use of BEDI, Inc. as the down payment called for by the stock subscription agreement between the defendants and Philip D. Cerami and L. Thomas Jones subsequently dated January 15, 1970 and said Albert J. Dignazio, instead of depositing it to the corporation account, deposited it to his own personal account, and thereafter used it to pay obligations incurred by him and his association in the development of the BEDI, Inc. project; and thereafter, to reimburse BEDI, Inc. assumed payments on $15,000.00 of the indebtedness of BEDI, Inc. to Delaware County National Bank mentioned in said agreement."

Accordingly, it is obvious that the chancellor's finding did not rest upon any prior oral agreements between the parties or any subsequent oral modification of the subscription agreement. As the court en banc explained: "The forego-

ing finding does not involve an alteration of any contract to compel the recognition of the parol evidence rule; nor does it involve a promise to answer for the debt of another to bring it within the statute of frauds. It merely involves an implied promise to repay money which belonged to another (BEDI, Inc.) which had been used properly or improperly by the promisor." We conclude that the chancellor's finding of defendants' indebtedness is supported by the record and is in accord with the traditional principle that once a court of equity assumes jurisdiction for one purpose it will retain it for all purposes in order to provide complete relief and do complete justice between the parties, including an award of equitable relief not covered by the original prayer. *Piercing Pagoda, Inc. v. Hoffner*, 465 Pa. 500, 351 A.2d 207 (1976).

Defendants' second contention is that the chancellor erred in applying defendants' debt to BEDI as an offset to plaintiffs' debt to the corporation. The essence of this argument is that it was improper for the chancellor to pierce the corporate veil.

Preliminarily, we note that, contrary to defendants' assertion, the second count of plaintiffs' amended complaint does in fact assert a derivative action on behalf of BEDI. Furthermore, the claim that the chancellor disregarded the corporate entity without indicating his grounds for doing so is refuted by the opinion of the court en banc wherein it is stated: "Initially and basically the defendants argue that the corporate identity of BEDI, Inc. was ignored. This is not a correct statement. The existence of the corporation was recognized by the chancellor but its veil was pierced in resolving the issues for the reason that the plaintiffs and the individual defendants conducted the business of the corporation from its inception in 1970 until the time the chancellor's adjudication was filed as though it did not exist." In support of this conclusion the court en banc noted the paucity of directors' meetings and the failure to observe corporate requirements. Moreover, the court en banc found that all of the parties had intermingled their personal interests with those of the corporation. These findings and conclusions are amply supported in the record.

■■■■ While a corporation is normally treated as an entity distinct from its shareholders, the corporate veil is properly pierced " 'and the individuals and corporation considered as identical whenever justice or public policy demand it and when the rights of innocent parties are not prejudiced thereby nor the theory of corporate entity made useless.' " *Great Oak B. & L. A. v. Rosenheim*, 341 Pa. 132, 136, 19 A.2d 95 (1941) quoting *Markovitz v. Markovitz*, 336 Pa. 122, 126, 8 A.2d 36 (1939). In addition, the fiction of corporate identity will be disregarded where the corporation is used in furtherance of personal interests. *Watercolor Group v. Wm. H. Newbauer*, 468 Pa. 103, 360 A.2d 200 (1976). Under the circumstances of the present case, particularly the intermingling of corporate and personal interests, we hold that the chancellor properly pierced the corporate veil and did not err in crediting defendants' indebtedness to the corporation as an offset to plaintiffs' debt to BEDI.

■■■■ Defendants' final argument is that the chancellor erred in awarding plaintiffs a credit in an amount equivalent to their proportional share of what defendants withdrew from the corporation as directors' fees after January 1, 1975. As will be recalled, on December 30, 1974, plaintiffs were successfully removed as managers of BEDI but, as found by the chancellor, plaintiffs had not forfeited their right to ownership of shares in BEDI and were entitled to continue serving as directors of the corporation. Thereafter, from January 1, 1975, through December 31, 1977, defendants paid themselves certain monies which they designated as directors' fees. Plaintiffs, however, received no payments during this time. Defendants argued that plaintiffs were not entitled to any of those fees for the period after February 15, 1975, because on that date plaintiffs refused to pay the balance allegedly due by them under the stock subscription agreement. In other words, defendants take the position that plaintiffs were not entitled to the so called directors' fees because they were allegedly in default of the stock subscription agreement as of February 15, 1975.

The fatal flaw in defendants' argument is that the chancellor found that although the defendants designated their withdrawals as directors' fees, those payments had no reasonable relationship to the meager services performed by them and were in fact simply a distribution of profits. Accordingly, plaintiffs as shareholders were entitled to their proportionate share of such corporate earnings.[7] In sum, whether the monies withdrawn by defendants from the corporation after January 1, 1975 are treated as directors' fees or distribution of profits, plaintiffs were entitled to share in those monies.

In conclusion then, having reviewed the record we are satisfied that the chancellor's comprehensive findings of fact and conclusions of law are supported by ample evidence and are, therefore, beyond reproach. Accordingly, the respective decrees entered in this case are affirmed.

7. Furthermore, since the chancellor found that plaintiffs were not in default of the subscription agreement and were thus wrongfully denied their right to serve as directors, they would be entitled to their share of those monies even if they were viewed as legitimate directors' fees.