Commonwealth ex rel. Truscott *v.* Yiddisher
Kultur Farband, Appellant.

Argued May 4, 1955. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Hymen Schlesinger,* for appellant.

*Edward Freedman,* Deputy Attorney General, with him *Herbert B. Cohen,* Attorney General, for appellee.

OPINION BY MR. JUSTICE CHIDSEY, June 27, 1955:

In this quo warranto proceeding the defendant, Yiddisher Kultur Farband, also known as Jewish Culture Association, appeals from an order of Judge ELLENBOGEN of the Court of Common Pleas of Allegheny County entered on January 25, 1955 under which its charter as a nonprofit corporation was revoked and a liquidating trustee appointed to administer its assets.

In the complaint filed on behalf of the Commonwealth, the Attorney General sought only the revocation of the defendant's charter and he stated at the oral argument and also in his written brief that in his opinion the order of the court should be modified so as to eliminate the court-appointed trustee and to permit the officers of the corporation to liquidate and distribute its assets. It also there developed that such modification of the order was the only matter seriously

pressed by the appellant. Following the appeal taken from the order, the hearing judge filed an opinion of some length in support of the order as entered. Under the circumstances the only question for our consideration and determination is whether the decree should be so modified as contended for by both the defendant corporation and the Attorney General.

This is the third time that litigation involving the defendant has reached this Court. The defendant was incorporated as a nonprofit corporation under the Nonprofit Corporation Law of May 5, 1933, P. L. 289. It obtained its charter from the Court of Common Pleas of Allegheny County on May 22, 1944. The application for the charter stated that the purposes for which the corporation was formed were to encourage the study of Jewish literature, arts and cultural pursuits, together with a number of similar objectives. About nine years later Harry Alan Sherman, as attorney for Samuel Louis Sherman and Paul Ginsburg, presented a petition in the court below as of the original term and number at which the charter was granted, praying that the petitioners be permitted to intervene specially as parties. They alleged that the incorporators perpetrated a fraud upon the court by misrepresenting the purposes of the corporation, that "its true and clandestine purpose being the establishment of a Communist formed, controlled and directed 'front' for unlawful purposes," that the existence of the corporation constituted a continuing fraud and that the corporate charter should be revoked. The petition was granted by Judge ELLENBOGEN. Preliminary objections filed by the Association were overruled but on appeal to this Court (375 Pa. 108) we sustained the preliminary objections and dismissed the intervenors' petition, holding that since they were not members of the Association and had no peculiar interest of their own, they

possessed no status as interested parties and it was for the Commonwealth and for it alone, acting through the Attorney General, to apply for the issuance of a writ of quo warranto. On December 9, 1953 the Honorable Frank F. Truscott, Attorney General, filed an action in quo warranto against the defendant corporation. Preliminary objections filed thereto raising a question of jurisdiction were overruled and on appeal to this Court the order of the court below was affirmed (378 Pa. 383). The defendant filed an answer denying all of the material allegations of the complaint which in summary averred that defendant's charter was obtained through perpetration of a fraud upon the court by misrepresentation of the purposes of incorporation, in that the actual purposes were to foster and promote unlawful Communist activities, and that the corporation had continuously engaged in such activities since its incorporation. After two pretrial conferences the case came to trial before Judge ELLENBOGEN and a jury on January 17, 1955. The defendant was represented in the proceeding by Hymen Schlesinger, and the Commonwealth by Deputy Attorneys General and Harry Alan Sherman, who was appointed as assistant counsel because of his connection with the earlier case.

At the pretrial conference held on January 3, 1955, counsel for the defendant stated that the corporation would surrender its charter if it were allowed time, suggesting ninety days, in which to dispose of its assets and wind up its affairs, and presented a proposed written stipulation in the form of a consent decree to this effect. After considerable discussion, Deputy Attorney General Friedman stated he would submit the stipulation to the Attorney General. During the interval between this pretrial conference and the trial, the Attorney General submitted to counsel for defendant three

alternative forms of consent decrees. At the outset of the trial the Deputy Attorney General then in attendance announced that an agreement had been reached with counsel for defendant that the following consent decree be entered: "And now, this      day of January, 1955, upon motion of Hymen Schlesinger, attorney for defendant, the parties consenting to this order and upon representation by said attorney for defendant that a resolution authorizing him to proffer the Charter of the above named corporation for revocation was adopted, and said attorney for defendant making such proffer in open court, It is Ordered and Decreed as Follows: 1. That the Charter of the defendant be revoked, effective as hereinafter provided. 2. The corporation is directed to liquidate and to dispose of its assets, real or personal, without liability on the part of any purchaser to see to the application of the purchase money, and to distribute the proceeds of any sale of real or personal property to the persons entitled thereto. 3. The Charter is hereby revoked said revocation to be effective for all purposes forthwith, except for the purpose of disposition of real and personal property held by the corporation, which said disposition shall be completed on or before March 17, 1955, at which time all corporate powers, franchises, rights, privileges and other powers and the rights, privileges and powers of the members and officers thereof which remain after the date of this order solely for the purpose of dissolution in connection with such corporation, shall cease and determine."

At this point Mr. Sherman, in defiance of the directions of his superior, the Attorney General, objected to the consent decree. The record reveals that throughout the proceedings Mr. Sherman was primarily interested in conducting an inquisition and desired that the trial continue, his ultimate aim being to ob-

tain the identity of all the members of the Association in order to subject them to criminal prosecution. Needless to say, such an objective was entirely foreign to the quo warranto proceeding. As the Attorney General states in his brief: "There is no doubt that knowledge as to the identity of the members of this organization might be of aid in tracking them down and discovering their activities. However, a quo warranto proceeding is not a police investigation, nor is it calculated to furnish the basis for such investigations.".

Mr. Sherman also, on his own initiative, opposed the consent decree unless a provision was contained therein that a trustee be appointed by the court for the disposition of the corporation's assets. Apparently in sympathy with Mr. Sherman's position, the court refused to enter the agreed upon consent decree and ordered counsel for defendant either to surrender the charter unconditionally or to proceed with the trial. In justification of this order the court, upon the preface "If the charges here made under oath by the Attorney General are true . . .", stated in effect (1) that the organization was a danger to the peace and safety of the Commonwealth and the nation; (2) that the officers of the corporation have perpetrated a gross fraud upon the court; (3) that instead of encouraging the study of Jewish culture, the organization was serving the Communist party; (4) that the judge could not be certain that the officers, whose identity was unknown,[1] would properly administer the assets, but on the contrary there was reason to believe that they would use them to serve the aims and purposes of the

---

[1] It is to be noted that Herman Gordon, the president of the corporation, who, as such, executed the answer filed to the complaint, was present at the pretrial conference and also appeared and testified at the trial.

Communist party. Following the court's alternative order, counsel for the defendant requested permission to consult his client concerning this order. The court denied the request and directed that counsel proceed to try the case without further delay. The Deputy Attorney General excepted to the action of the court.

After the case, marked by continuous colloquies between counsel for the defendant and the hearing judge, had been in progress for over a week, counsel fearing that the court's threat of disciplinary action toward him would militate against his client's cause, asked for leave to withdraw from the case. Before any action was taken by the court on this motion, counsel requested permission to consult with his client. This request was denied. The motion to withdraw was granted and counsel advised that he was out of the case. When counsel subsequently renewed his request to consult with his client, the court replied, "You have no more client, you are out of the case.". The court thereupon called the president of the corporation into his chambers, informed him that he had 24 hours within which to secure a lawyer and suggested that it might be to the best interests of the corporation to surrender its charter. After the luncheon recess the president was called to the bar of the court and "reluctantly" agreed to surrender the charter unconditionally as the court insisted, for the reason that he was physically unable to secure counsel and thereby continue with the defense of the case. The surrender was accepted by the court, the jury discharged and shortly thereafter an order was entered, dated January 25, 1955, under the terms of which the court revoked the charter, appointed a liquidating trustee to take charge of the real and personal property and all personal effects of the corporation and to proceed to liquidate and wind up its assets. Thereafter the court informed the

trustee that Mr. Sherman and another named attorney would act as his counsel.[2]

The court below held that its right to appoint a liquidating trustee was clear for any one of four reasons: (1) if the surrender of the charter be considered voluntary, power was granted by the Act of May 5, 1933, P. L. 289, §1001 as amended, 15 PS §2851-1001; (2) the authority was necessary and inherent in the judicial power; (3) if the surrender be considered involuntary, the court was given power under the Act of April 4, 1872, P. L. 46, §1, 15 PS §503, or (4) the Act of April 26, 1893, P. L. 26, §1, 15 PS §521.

In our opinion the Act of May 5, 1933 has no application to the instant case. The Act provides for the voluntary dissolution of a nonprofit corporation and outlines with particularity the procedure to be followed thereunder. Section 1001 of the Act provides that a petition, signed and verified by at least two duly authorized officers of the corporation, under seal, shall be filed with the court setting forth, inter alia, the time and place of the meeting at which the resolution authorizing the institution of voluntary proceedings was adopted and the vote thereon; an inventory of all the real and personal property of the corporation; a statement of all the liens and encumbrances upon the corporate property and the names and addresses of all existing members. The record does not show and the court made no attempt to ascertain whether any of these statutory prerequisites were complied with by the defendant corporation. Counsel for defendant had set forth in his proposed consent decree and in the

---

[2] It is stated in the Commonwealth's brief that ". . . Upon learning these facts, the Attorney General [Honorable Herbert B. Cohen, who succeeded Mr. Truscott] dismissed Harry Alan Sherman from the case.".

agreed upon decree which the court refused, that a resolution had been passed authorizing him to thus proffer the charter of the corporation. Despite this representation, the surrender ultimately acquiesced in by the president of the corporation differed substantially and materially from what was purportedly resolved by the members, and for all that appears it was accepted by the court on the president's authority alone. It is significant that prior to the selection of a jury, counsel for defendant requested the Court to allow him time to have a meeting called of the officers and members so that they might consider the court's order of unconditional surrender. As previously indicated, this request was denied and counsel was directed to try the case without further delay. When the Deputy Attorney General questioned the manner in which the charter was being surrendered, the court replied, "I'm not worried about that.". In *Sherman v. Yiddisher Kultur Farband,* 375 Pa. 108, 111, 99 A. 2d 868, this Court said: "All corporations, whether for profit or nonprofit, are creatures of statute, which prescribes not only how they shall be formed but how they shall be dissolved: . . .". Moreover, the action of quo warranto being an adversary proceeding, it was not converted into a voluntary dissolution by the surrender of the charter under the circumstances here present. The record discloses that the charter was surrendered reluctantly by Mr. Gordon, the president of the corporation, at the court's insistence, for the reason that he was physically unable to procure counsel within the 24-hour period allotted to him by the court.

The case of *Milasinovich v. The Serbian Progressive Club, Inc.,* 369 Pa. 26, 84 A. 2d 571, cited by the lower court to sustain the proposition that it had inherent power to appoint a receiver is equally inapposite. In that case five alleged members of the nonprofit cor-

poration there involved brought an action in equity to restrain the officers of the corporation from diverting the assets of the corporation toward subversive uses. We there held in affirming the lower court's action appointing a receiver pendente lite that a court of equity has power to appoint a receiver in order to prevent corporate assets from being wasted or used for unlawful purposes. The above principle, which is universally recognized in a proper case in equity, must be distinguished from the present proceeding which is an action of quo warranto. This Court has held that since the functions of a receiver have no relation to the exercise of a franchise which is the sole question raised upon a quo warranto, no authority exists for his appointment in such proceedings unless it is found in express statutory provision: *Commonwealth v. Order of Vesta. Kennedy's Appeals.*, 156 Pa. 531, 534, 27 A. 14; *Fraternal Guardians' Assigned Estate. Tull's Appeal,* 159 Pa. 603, 28 A. 479.

The ownership and possession of the assets of a corporation dissolved upon proceedings of quo warranto was originally defined by the Act of April 4, 1872, supra, which provided that "Whenever any corporation, incorporated under the laws of this commonwealth, shall have been dissolved by judgment of ouster, upon proceedings of quo warranto in any court of competent jurisdiction, all the estate, both real and personal, of which such corporation [is] in any way seized or possessed, shall pass to and vest in the persons who at the time of such dissolution are the officers of such corporation, in trust to hold the same for the benefit of the stockholders and creditors of the corporation.". This Court, construing the above Act in *Commonwealth v. Vesta,* supra, held that the Act on its face clearly revealed that the regular and ordinary course of the administration of the assets is

by the officers of the corporation as trustees and that there was no jurisdiction in the court of common pleas to appoint a receiver on motion of the Commonwealth in quo warranto proceedings. This principle was reiterated and followed in *Fraternal Guardians' Assigned Estate,* supra.

The courts of common pleas were initially empowered to appoint a receiver in quo warranto proceedings by the Act of April 26, 1893, supra. [3] This enactment provided that "Whenever any corporation incorporated under the laws of this commonwealth shall be dissolved by judgment of ouster upon proceedings by quo warranto in any court of competent jurisdiction, the said court, or in vacation any one of the law judges thereof, shall have power to appoint a receiver, who shall have all the powers of a receiver appointed by a court of chancery, to take possession of all the estate, both real and personal, thereof, and make distribution of the assets among the persons entitled to receive the same according to law. The powers of such receiver may continue as long as the court deems necessary for said purposes, and he shall be held to supersede an assignee of the corporation in possession.". By virtue of this statute and this statute alone the court below had the authority to appoint a liquidating trustee and the only remaining question is whether that power was properly exercised in this case.

As a general rule the appointment of a receiver is a matter within the discretion of the court below, and its action will not be disturbed unless there is a clear abuse of sound judicial discretion: *McDougall et al. v. Huntingdon and Broadtop R. & C. Co.,* 294 Pa. 108, 143 A. 574; *Franklin National Bank et al. v. Kennerly Coal*

---

[3] An enlightening comment on this Act is found at p. 536 of *Commonwealth v. Vesta,* supra.

& *Coke Co.,* 300 Pa. 479, 150 A. 902. Judicial discretion, however, is governed by legal principles applicable to the situation. If in reaching a conclusion the law is departed from or misapplied or the judgment exercised is manifestly unreasonable as shown by the evidence or the record, discretion is then abused and it is the duty of the appellate court to correct the error: *Echon, Admrx. v. Pennsylvania Railroad Company,* 365 Pa. 529, 76 A. 2d 175; *Maxwell v. Enterprise Wall Paper Mfg. Co. et al.,* 131 F. 2d 400. As was stated in *Philadelphia County Grand Jury Investigation Case,* 347 Pa. 316 at p. 326, 32 A. 2d 199: "Judicial discretion requires action in conformity with law upon the facts and circumstances before the court after hearing and due consideration. In Osborn v. U. S. Bank, 9 Wheat. 738, 866, Chief Justice MARSHALL said: 'Judicial power, as contradistinguished from the power of the laws, has no existence. Courts are the mere instruments of the law, and can will nothing. When they are said to exercise a discretion, it is a mere legal discretion, a discretion to be exercised in discerning the course prescribed by law; and, when that is discerned, it is the duty of the Court to follow it. Judicial power is never exercised for the purpose of giving effect to the will of the Judge; always for the purpose of giving effect to the will of the Legislature; or, in other words, to the will of the law.' . . .".

In this proceeding the sole purpose of the Attorney General was to procure the revocation of a charter of a nonprofit corporation. The prayer of the complaint sought the following relief: that ". . . it be adjudged that the defendant corporation has forfeited its charter, franchises and privileges, and that it has no longer power to exercise any corporate rights or privileges whatever, and that its officers and members be forbidden to act under its said incorporation or to do, or to

claim to do, any acts, matters or things thereunder; and that the said defendant corporation, and its officers and members, be henceforth altogether excluded from all rights, privileges and franchises, and that the charter of the aforesaid corporation be declared forfeit.". No party in interest asked for or desired a receiver. Mr. Sherman was not an "interested party" in contemplation of law. He was appointed by the Attorney General and was therefore subordinate to his superior's orders and directions. These he unwarrantedly exceeded in attempting to conduct a blanket investigation criminal in character. This is manifest from his statements and conduct throughout the proceeding. To cite only one illustrative instance, he stated to the court that "On November 27, 1953, in a long letter addressed to the Attorney General of Pennsylvania, I was beseeching his entry to a quo warranto proceeding; but I was asking for more than just a revocation of a charter, and I listed a lot of the evidence we have in our possession for the purpose of bringing in the official administrative law agent of the Commonwealth. . . . I wrote to him November 27, 1953, and concluded with this paragraph—that is one of the concluding paragraphs: 'In this situation mere quo warranto proceedings instituted in the name of the Attorney General would doubtless result in judgment by default, declaring the charter forfeit. I am certain, therefore, that a broader aspect would justify presentment to a grand jury, with undoubted beneficial consequences to the city and the nation.' ".

Obviously the Attorney General appreciated the fact that full compliance with Mr. Sherman's request would necessitate additional proceedings before other appropriate tribunals. By instituting the quo warranto action he demonstrated that his immediate concern was the revocation of defendant's charter. Mr. Sherman's

actions at the trial indicate that he was laboring under the misapprehension that the criminal and civil aspects of this case could both be tried in the present proceeding. Unfortunately the court seemed to be of the same opinion. Although the trial judge on several occasions stated to Mr. Sherman that remarks made by him were irrelevant, in the long run he permitted him to indulge in violent diatribes accusing members of the defendant Association of subversive activities, which unquestionably would have required the grant of a new trial if the case had gone to the jury and resulted in a verdict against the defendant. As we stated in *Schlesinger Petition,* 367 Pa. 476, 483, 81 A. 2d 316: "It need hardly be stated that this Court is as opposed to communism in all its manifestations as the respondent Judge who instituted these contempt proceedings. But it is our sacred duty to uphold the Constitutions and laws of our Country and State and their provisions as to due process of law. What the Judge has done, in his zeal against communism, is to adopt the detestable method employed by communists themselves in arbitrary and unjudicial proceedings contrary to all our cherished traditions of law and legal procedure.".

Although there is statutory power under the Act of 1893 for the appointment of a receiver upon a judgment of ouster in a quo warranto proceeding, the court palpably abused its discretion in the instant case by entering an order which not only exceeded the prayer of the complaint but presumed to determine a matter entirely extraneous to the issue. The relief afforded by a decree must conform to the case as made out by the pleadings and should be consistent with the relief prayed for: *Luther v. Luther,* 216 Pa. 1, 64 A. 868. See also *Bowman v. Gum, Incorporated et al.,* 321 Pa. 516, 525, 184 A. 258; *White et al. v. Chester Municipal Authority et al.,* 349 Pa. 118, 36 A. 2d 455. The appoint-

ment of a receiver is the exception, not the rule, and ordinarily is not to be made unless some interested party, normally a shareholder or creditor, or as in this case the Attorney General, asks for it and shows that the administration of the corporation's assets under the control and supervision of the court is necessary. In the instant case it is clear that the court did not appoint the liquidating trustee and designate counsel for him in order to protect the members of the Association against waste or dissipation of the assets of the corporation following its dissolution. On the contrary, the unwarranted imposition on the corporate assets of liability for the trustee's compensation and counsel fees amounted to an expropriation of private property by judicial fiat on the assumption that the members of the corporation, or some of them, are Communists or Communist sympathizers. Whatever their criminal culpability may be, they are nonetheless entitled to the constitutional guarantee that they shall not be deprived of their property without due process of law.

The order of the court below appointing a liquidating trustee is vacated and the judgment of ouster is affirmed.

Mr. Justice BELL did not participate in the consideration or decision of this case.

———

DISSENTING OPINION BY MR. JUSTICE MUSMANNO, August 27, 1955:

On May 22, 1944, the Court of Common Pleas of Allegheny County granted a charter to an organization entitled the Yiddisher Kultur Farband (also known as the Jewish Culture Association) on the petition of eight persons who asserted that the objectives of the organization were to foster the study of "Jewish litera-

ture, music, painting, sculpture and the arts and cultural pursuits."

On March 23, 1953, the same Court issued a rule on the corporation to show cause why its charter should not be revoked since it was reported to the Court by two American citizens that the charter had been fraudulently obtained, and that, instead of dedicating itself to the pursuit of Jewish culture, the Yiddisher Kultur Farband was in reality furthering the aims of the Communist Party. At a preliminary hearing on this rule, conducted before the Honorable HENRY ELLENBOGEN, Judge of the Court of Common Pleas of Allegheny County, Joseph Saul, one of the incorporators and financial secretary of the Yiddisher Kultur Farband (hereinafter referred to briefly as the Farband), was asked whether he was or had ever been a member of the Communist Party. He refused to answer "on the ground of self-incrimination."

The Farband appealed to this Court under the Act of March 5, 1925 (P. L. 28), raising the question of jurisdiction and this Court held that in the circumstances, only the Attorney General could, through quo warranto proceedings, seek the revocation of the Farband's charter. (375 Pa. 108.) I dissented from the Majority's conclusions and wrote an Opinion embodying my views on the subject. (375 Pa. 117-135).

On December 9, 1953, the Attorney General of the Commonwealth filed an action in quo warranto against the Farband, averring under oath that the activities of the organization were "incompatible with American citizenship;" that it was engaged in "soliciting funds for the support of communistic projects and for the benefit of known communists;" and that its premises were being used as a rendezvous "for the purpose of conducting classes in, and teaching methods of, subversion, sabotage, dissemination of communistic propa-

ganda and the advancement of the aims and purposes of the *communistic revolution.*"*

After intermediate proceedings not necessary to relate here, the cause, after an answer filed by the Farband, came on for trial before Judge ELLENBOGEN and a jury. At the trial many books and pieces of literature taken from the premises of the Farband were introduced in evidence. There can be no doubt that the nature of the printed matter confirmed the averment of the Attorney General that the activities of the Farband were "incompatible with American citizenship." Hymen Schlesinger, attorney for the Farband, has argued that all the revealing literature could be obtained at public libraries and bookstores. I do not believe that this statement can be supported in fact. In any event, it is quite apparent that the quantities in which the publications were found on the premises and the fact that the titles all concentrated on one specialized, particular subject matter (namely, support for the Soviet Union and Communist aims and objectives), demonstrate almost conclusively that the Farband was a focal point for the gathering, distribution and dissemination of Communist propaganda.

A few of the titles presented at the trial, some with explanatory text, are listed:

Exhibit 28. Explanatory text: "Jewish writers and artists committee, the Jewish Fraternal Peoples Organization plays an important part in this particular community that seeks to create unity of all Jewish communities all over the world, in the first place between the two big Jewish communities, the United States and the Soviet Union."

Exhibit 30. "Homeland, Moscow, 1947."

Exhibit 34. "New Masses, Nov. 27, 1945."

---

* Italics throughout, mine.

Exhibit 35. "Soviet Union, Foe or Friend."

Exhibit 40. Explanatory text: "Victory of the Red Army is also the victory of the Jewish people."

Exhibit 41. "China fights for freedom."

Exhibit 42. "Paul Robeson, Citizen of the World."

Exhibit 43. "The Last Days of Sevastopol" published by "Soviet Russia Today."

Exhibit 45. "Seventh Convention Report of I.W.O. 1947."

Exhibit 46. "Petition to United Nations." Frontispiece reads: "We charge Genocide, the historic petition to the United Nations for relief from crimes of the U. S. Government against negro people."

Exhibit 48. "35 Years of Soviet Progress, New World Review, 1952" with pictures on front page of Lenin and Stalin.

Exhibit 49. "15 Red Army Songs."

Exhibit 51. "The songs of heroic Jewish revolutionaries under the Czarist Russia."

Exhibit 62. Bundle of "Morning Freiheits" (Jewish edition of Daily Worker.)

Exhibit 64. "Aufgang". Explanatory text: "We are teaching ourselves revolutionary traditions of the young Communists."

Up until the termination of the trial, through the revocation of the charter, not one piece of evidence in the case gave any substantiation to the charter application that the Farband was dedicated to the promotion or study of Jewish culture. The president of the organization, Herman Gordon, admitted that the Farband did not have or ever did have a director of cultural activities. Further: "Q. Do you know a single one of your officers who has at any time been qualified to teach either Jewish history or American history? A. If you refer to receiving degrees from a uni-

versity, I would not be aware of that situation. Q. Has anyone ever taught that you know of? A. No."

Although Herman Gordon was a charter member of the Farband he seemed surprised to learn that the purpose of the organization was to inculcate Jewish culture: "Q. Did you know that the chartered purposes of this organization where to enlighten Jews in this community on American Jewish culture? Do you know that? A. Does the charter provide for American Jewish culture? Q. Soviet Jewish culture, does it? MR. SCHLESINGER: I move the last remark be stricken from the record. The witness simply asked him was that limited to American Jewish culture. I think the remark of counsel is prejudicial and move it be stricken. THE COURT: It was not a remark; it was a question. Proceed, Mr. Sherman. BY MR. SHERMAN: Q. Did you read the charter? A. No."

Gordon's answer that he never even read the charter of the organization, of which he was an originator, and of which he was the current president, is quite indicative of the cloaked purpose of the Yiddisher Kultur Farband. And the fact that he admitted he had been a member of the Communist Party adds significance to the whole sinister enterprise. It is also revealing that the Yiddisher Kultur Farband of Pittsburgh is not localized, but is part of a larger organization with a national program: "Q. At the time the charter application was made to this court, it was the purpose of your organizing group to get sort of a sub-organization to the New York organization, is that right? It was affiliated with the New York organization? A. In a sense it had the same purpose; not technically. Q. There was a program that was national, not only local, wasn't there? A. That's right."

The masquerade that the Farband was devoted to Jewish culture was worn so loosely that the whole op-

eration amounted to grotesque minstrelsy. Gordon was not only professedly ignorant of the charter of the Farband but he never saw or cared whether the organization possessed a constitution and by-laws: "Q. Did you ever see any constitution and bylaws in this organization? A. No. Q. Did anyone ever tell you that there was a constitution or bylaws? A. No. Q. Did anyone ever tell you you were qualified by reason of any constitution and bylaws to run for office. A. No. Q. Was there any opposition to you as president? A. No."

He testified that he was unaware as to whether there was a quorum present when he was elected president, or that the persons who voted for him were actually members! He only remembered that Attorney Hymen Schlesinger was present at the time of the election but did not specify whether Schlesinger was a member. He pretended to be in the dark as to the number of members of the organization over which he presided: "Q. How many members in this organization altogether? A. I couldn't answer that because I don't know how many members there are. Q. You don't know whether there are 100 or 10? A. Right. Q. Are you sure of that? A. Positive. Q. Are you positive of that? A. Right."

He denied all knowledge of financial transactions; did not know whether the members paid dues or not; as president he never signed a Farband check or even saw one; he never came into contact with any of the Farband's bills; he never attended a meeting of the Executive Board and said he was present at only one meeting at the Farband headquarters during the preceding year.

One cannot help but conclude, after reading Gordon's testimony, that arrogance, craftiness and chicanery underlay the whole pattern of his testimony

and that he was artfully endeavoring to paint stripes of confusion over the true color of the subversive organization he headed.

That the Farband is part of the Communist apparatus was confirmed by the numerous motions made by its attorney, Hymen Schlesinger, to disqualify Judge ELLENBOGEN because Judge ELLENBOGEN has vigorously condemned the Communist Party and Communism. In one motion for such disqualification, Attorney Schlesinger advanced the following reason: "Said Judge entertains and is motivated by an extreme bias and prejudice against Communists and the Communist Party as to render him unfit and disqualified *to adjudicate the issues in this case which include the program, platform and objectives of the Communist Party, beliefs and activities of Communists . . .*"

If the Farband were not a Communist organization, there would of course be no point in demanding Judge ELLENBOGEN'S disqualification on the basis that he is biased against Communist organizations.

On January 17, 1955, Attorney Schlesinger stood before the Court and for 40 minutes bitterly inveighed against Judge ELLENBOGEN. The tirade, for it can scarcely be denominated anything else, was pretentious, presumptuous, and as empty of respect as it was of law. Because Judge ELLENBOGEN had said that the Communist Party is dominated by a foreign power which is hostile to the United States, Attorney Schlesinger charged: "That opinion of your Honor was directly in conflict with the opinion of the State Supreme Court in 364 Pa. 504, where the Supreme Court said, 'There is nothing in the platform of the Communist Party which is illegal, that it is no more defamatory to call a man a Communist than it was to call him a Prohibitionist,' and that 'the Communist Party was a legitimate political party offering its can-

didates for election, and that its program, its advocacy of socialism, was in essence the same as the advocacy of socialism by the Socialist Party." A reading of the text in the case of *McAndrew v. Scranton Republican Publishing Company,* 364 Pa. 504, however, fails to produce the quotations advanced by Attorney Schlesinger. In any event, the ideas expressed in the *McAndrew* case with regard to Communism and the Communist Party have been repudiated by this Court, the Supreme Court of the United States and the Congress of the United States.* The Communist Party was properly defined by Judge ELLENBOGEN when he said that it is "a criminal conspiracy engaged in the violent overthrow of the existing governments of this State and of the nation."

Throughout his 40-minute Philippic, Attorney Schlesinger strenuously defended the Communist Party, asserted that the Soviet Union guaranteed religious freedom within its domains, maintained that the Supreme Court of the United States had, "in effect," declared "that the Communist Party attempts

---

* *Albert Appeal,* 372 Pa. 13; *Dennis v. U. S.,* 341 U. S. 494; Communist Control Act of 1954, 68 U. S. Statutes at Large, p. 775, Public Law 637.

In his Concurring and Dissenting Opinion in the case of *American Communications Assn., C. I. O. et al. v. Douds,* 339 U. S. 382, 429, Mr. Justice JACKSON said: "It would be incredible naivete to expect the American branch of this movement to forego the only methods by which a Communist Party has anywhere come into power. In not one of the countries it now dominates was the Communist Party chosen by a free or contestible election; in not one can it be evicted by any election.

The International police state has crept over Eastern Europe by deception, coercion, coup d'etat, terrorism and assassination. Not only has it overpowered its critics and opponents; it has usually liquidated them. The American Communist Party has copied the organizational structure and its leaders have been schooled in the same technique and by the same tutors."

to achieve its aims by peaceful means," and declared that Judge ELLENBOGEN'S decision against allowing Communists to teach in the Pittsburgh schools amounted to a "witch hunt." Mr. Schlesinger not only berated the Trial Court for its judicial pronouncements on the evils of Communism and the Communist Party, but he insisted also that Attorney Harry Alan Sherman, who was at the time representing the Commonwealth as special counsel, be disqualified, because: "Who is Mr. Sherman? Mr. Sherman is president of 'Americans Battling Communism.' The avowed objective of Americans Battling Communism is exactly what the title says." Communism is the scourge of the world today. It has taken civilization to the brink of disaster and threatens to push it over into the abyss of absolute annihilation unless its despotic and terroristic demands are met. Thus, for a lawyer in an American courtroom to denounce another lawyer for battling Communism represents, as I view it, the apogee of effrontery, the nadir of banality, and the ultimate in purposeful astigmatism as to what constitutes the obligations of Americans opposing the enemies of America.

Mr. Schlesinger shot other vituperative arrows. He attacked the FBI undercover agents, he characterized this very trial which he himself had demanded as a "heresy trial"; he clamored that the notes of the court stenographer be impounded and when asked by the Court for his reasons replied that: "There are unknown forces behind this whole thing"; he insisted he had the right to read in court a statement he had given to the newspapers. In a proceeding before the Court on January 3, 1955, he referred to the Attorney General of the Commonwealth in the following derogatory language: "I don't know whether there is any joker in the mind of the Attorney General. If there is I would

like to have it now." It is, therefore, understandable why on one occasion Deputy Attorney General Friedman in court was moved to say: "I am sorry Mr. Schlesinger is making a fool of himself."

I have given this much attention to the extraordinary deportment of Mr. Schlesinger not only because, as we will see later, it has a direct bearing on the issue decided by this Court, but because, although the Majority Opinion is censorious of the Trial Court and special counsel for the Commonwealth, it has offered no criticism of Mr. Schlesinger whose conduct, had it not been for the excessive forbearance of the Trial Judge, would have entitled him to numerous contempt citations.

Mr. Schlesinger's astounding behavior throughout the entire trial reached its progressive and startling climax when he asked leave to withdraw from the case. Commenting on this feature of the proceedings, the Majority said: "After the case, marked by continuous colloquies between counsel for the defendant and the hearing judge, had been in progress for over a week, counsel fearing that the court's threat of disciplinary action toward him would militate against his client's cause, asked for leave to withdraw from the case." The Majority cannot inflexibly assume that the reason advanced by Mr. Schlesinger for asking to retire from the case necessarily reflected the true motivation behind his action. Watching the trial through the window of the record, one observes in Mr. Schlesinger a resourceful and agile practitioner, ready for any tactic, maneuver, or strategy to defend his client and harass the opposition. He made seven different motions to disqualify the Judge, he employed caustic and disrespectful language toward the Court for which he sometimes apologized and at other times compounded the insult. His motion to quit the contest could well have

been a ruse calculated to excite sympathy in the jury box without the mover harboring the thought that the Court would entertain the ostentatious and audacious proposal. The plan, however, misfired when the Court took Mr. Schlesinger at his word. That sincerity did not accompany his offer to relinquish the defense was conclusively established when, perceiving that the Court saw through his stratagem, Mr. Schlesinger frantically sought to call back his tongue-in-cheek proposition.

The Court's acceptance of Mr. Schlesinger's request did not, however, cause his client to suffer any more at that moment than it might have suffered many times during the proceedings, since Schlesinger's contemptuous attitude toward the Court could well have removed him from the trial on numerous occasions.

The abandonment of a client's cause in mid-trial is a serious matter, but whatever may have been Mr. Schlesinger's motive in this respect, it was he alone who lifted the trapdoor of retreat. However, as soon as he dropped out of the case, through his own conscious act, Judge ELLENBOGEN notified Herman Gordon to obtain other counsel, adding: "I would like to see this case ended, and it would seem to me that even from the viewpoint of this defendant, the very best thing to do would be to surrender its charter forthwith to the Court." The Court explained also that Mr. Gordon would have 24 hours in which to "secure a lawyer and consult with him and bring him into Court tomorrow morning." Mr. Coll, Deputy Attorney General, offered to help Mr. Gordon: "I might say this to Your Honor that I shall be glad to make available to such counsel as Mr. Gordon will select the record in this case." Mr. Gordon at this juncture apparently decided on a new plan of obstructionism: "I doubt wheth-

er there is an attorney in the City of Pittsburgh who would want to touch the case."

The Court urged: "If you make an effort to obtain counsel, you will have no difficulty getting counsel. This is a civil case, and it is not a difficult case."

Mr. Gordon persisted in his refusal to seek a lawyer and declared: "Physically I am unable to go around and visit counsel, visit people. I am just unable. In view of that situation, I will have to reluctantly agree to the surrender, because I am unable to continue."

The Trial Judge accepted the surrender of the charter thus proffered and formally revoked it. At the same time he appointed a very reputable attorney, Milton E. Harris, Esq., as liquidating trustee. The Farband appealed to this Court, asserting that the revocation of the charter was illegal. This Court affirmed the judgment of ouster, vacated Judge ELLENBOGEN'S order appointing a liquidating trustee, and filed an Opinion which, with all respect, I am impelled to say is an enigma. It ends up with the statement: "The unwarranted imposition on the corporate assets of liability for the trustee's compensation and counsel fees amounted to an expropriation of private property by judicial fiat on the assumption that the members of the corporation, or some of them, are Communists or Communist sympathizers. Whatever their criminal culpability may be, they are nonetheless entitled to the constitutional guarantee that they shall not be deprived of their property without due process of law."

I do not understand how it can be said that the appointment of a trustee who will function only under the supervision of the Court can be regarded as depriving anyone of property "without due process of law."

Mr. Harris filed a bond of $30,000 for the faithful performance of his duties as trustee, his accounts would be under the scrutiny of the Court; excessive fees would not be permitted and the squandering of assets could not take place. Where would there be "expropriation of private property by judicial fiat"? There would always be the right of appeal to this Court on the part of anyone who felt himself aggrieved by any action of the trustee.

The Majority Opinion treats with astonishing casualness the criminal nature of the organization whose charter was revoked. It blandly states that their financial transactions must not be supervised by the Court, no matter what "their criminal culpability may be." Suppose the Farband had been made up of a band of embezzlers who had acquired large sums of money by operating under a charter fraudulently obtained. Could it be argued that the Court should allow such malefactors to divide their tainted treasury without intervention of the law?

Although affirming the action of the lower Court in revoking the Farband charter, the Majority Opinion suggests that there was something coercive about the manner in which the revocation came about, saying: "The record discloses that the charter was surrendered reluctantly by Mr. Gordon, the president of the corporation, at the court's insistency, for the reason that he was physically unable to procure counsel within the 24-hour period allotted to him by the court." It is undoubtedly true that Gordon reluctantly parted with the charter which he and seven others had meretriciously secured, but this does not mean that he was coerced into surrendering it. He had little choice in the matter. The evidence so clearly demonstrated the fraud which had been practised on the Court that any extended defense of the organization's illegality might

well have resulted in serious consequences to Mr. Gordon.

The Majority misapprehends the testimony when it says that Gordon surrendered the charter "for the reason that he was physically unable to procure counsel within the 24-hour period allotted to him by the court." The record shows that Gordon absolutely refused to lift a hand, a telephone, or his voice in any attempt to summon further legal aid. It is quite revealing that immediately after the Court suggested that Gordon might consider a voluntary yielding up of the charter, Gordon said: "Judge, could we ponder for *five minutes,* since we are not in Court, the possibility of the question of surrender?" It is here obvious that Gordon must already have formed an intention to give up the charter or he would not have allowed himself a mere five minutes to reach so vital a conclusion. His request for the five minute deliberation occurred at the morning session of the Court on January 25, 1955. That very afternoon at 1:30 o'clock, Gordon surrendered the charter. The explanation he later made that he was unable to get counsel was offensive subterfuge. Even of the time allotted him he still had over 20 hours to go, before the 24-hour period expired. Moreover, the Trial Judge stated in his Opinion: "We gave the defendant twenty-four hours to engage other counsel, offered to assist in obtaining counsel for the defendant, and fully intended that, if defendant was not able in a twenty-four hour period to obtain counsel, to allow additional time. We would have allowed new counsel adequate time to become familiar with the case before proceeding therewith."

But over and above all this, Mr. Schlesinger stated in open Court that *the defendant corporation had adopted a resolution authorizing the surrender of the charter.* Thus, the Majority's observations on any sup-

posed reluctant surrender of the charter are discursive rather than decisional. The charter revocation is irrevocably planted on the solid ground of the law and no animadversion can dislodge it. We come now to the real issue in the case.

In revoking the charter, Judge ELLENBOGEN found: "That the building owned by said corporation, its name, charter and other assets have been seized and are being used by persons unknown to the president of the corporation and unknown to this Court, which said persons have been and are now using the charter, name, building and other assets of said corporation *for illegal purposes,* contrary to the public interest and in clear violation of the purposes for which the charter of the Defendant corporation was issued."

What were these illegal purposes? They were set forth by the Attorney General in his Complaint in Quo Warranto, namely: "Since the date of its incorporation, the premises of said corporation have been used for the purpose of conducting classes in, and teaching methods of, subversion, sabotage, dissemination of communistic propaganda and the advancement of the aims and purposes of the communistic revolution."

The premises in question consist of a formidably built, spacious two and one-half story gray-stoned manse at 6328 Forbes Street, Pittsburgh in a high class residential district. What was to be done with this large edifice and the equipment which it contained? Since the Court found it to be a gathering place for persons advancing the aims and purposes of the communistic revolution, it would have been ignoble stultification for the Court to allow the establishment to continue in its operations against the interests of the United States. Nor could the Court have allowed the premises to be sold without supervision when there was the possibility and even the probability that the

resulting funds would be recruited for the same subversive purposes to which the building itself had been committed.

In his prayer for relief the Attorney General asked that the "said defendant corporation and its officers and members be henceforth excluded from all rights, privileges and franchises." Part of those rights, privileges and franchises certainly included the use of funds which the Farband had accumulated and would additionally derive from the sale of its property. Since the organization was adjudicated to be an illegal one, its assets were bound to be illegal. The funds of the Farband were an instrument of the contraband corporation as much as burglar tools are the equipment of a burglar's gang. Yet, this Court is turning over these tools to the very persons who, according to the Court's decree, have been excluded "from all rights, privileges and franchises" arising from the organization.

A situation similar to the one before us arose in the case of *Milasinovich v. The Serbian Progressive Club*, 369 Pa. 26, 30, where this Court, speaking through Mr. Justice ALLEN M. STEARNE, said: "It was testified that the purposes of the corporate charter were being perverted. Communistic doctrines were being substituted for those of the corporation. There clearly existed a danger that instead of educating its members to become worthy citizens of the United States of America and to respect and obey the laws of the United States, *the corporation was now teaching and advocating the overthrow of the government of the United States by force and violence. The assets of the corporation were being diverted and used for communistic propaganda. The real and personal property of the corporation was in jeopardy.* The chancellor in such circumstances correctly issued the injunction and by a supplemental decree *appointed a receiver.*"

The Majority Opinion says that this Serbian Progressive Club case is inapposite. I believe it is very apposite. Assuming, however, arguendo, that it is inapposite, we read further in the Majority Opinion: "This Court has held that since the functions of a receiver have no relation to the exercise of a franchise which is the sole question raised upon a quo warranto, no authority exists for his appointment in such proceedings *unless it is found in express statutory provision.*" The *express statutory provision* which the Majority demands is found squarely within the Act of April 26, 1893, P. L. 26, Sec. 1, 15 PS Sec. 521, which says: "Whenever any corporation incorporated under the laws of this commonwealth shall be dissolved by judgment of ouster *upon proceedings by quo warranto* in any court of competent jurisdiction, *the said court,* or in vacation any one of the law judges thereof, *shall have power to appoint a receiver,* who shall have all the powers of a receiver appointed by a court of chancery, to take possession of all the estate, both real and personal, thereof, and make distribution of the assets among the persons entitled to receive the same according to law."

Judge ELLENBOGEN followed the mandates of the Legislature and appointed a receiver. By reversing Judge ELLENBOGEN'S appointment of a receiver, the Majority outrightly flouts the expressed will of the Legislature. Of course, this it may do because its power is supreme. The decisions of the Supreme Court are always enforcible because the Supreme Court, right or wrong in any given instance, has the last word in Pennsylvania as to what constitutes the law. But when the Supreme Court renders a decision squarely in opposition to what the lawmakers of the Commonwealth have sanctioned, I am compelled as a member

of this Court to formally note that a judicial usurpation has taken place.*

The Majority says that the lower Court abused its discretion but it failed to state wherein such abuse occurred. What innocent person could possibly be harmed by the administration by a Court-appointed trustee of a judicially-declared illegal organization? If any guileless individuals were drawn into the organization not knowing its true purposes, they would be protected. The Court below specifically declared in open Court: "We don't want the name of innocent persons disclosed."

The Majority says: "The Court palpably abused its discretion in the instant case by entering an order which not only exceeded the prayer of the complaint but presumed to determine a matter entirely extraneous to the issue." The Court below did not "presume" to do anything. It acted entirely within the scope of the pleadings in the case and the matters which naturally flowed from the averments in the pleadings. It was not extraneous to the issue for the Court to guard the interests of the public from any continued use of Farband's funds for Communist objectives. To revoke the charter of an illegal organization and not dissolve the organization is like lifting the firearms permit of an outlaw but declining to take away his revolver.

In the situation which confronted Judge ELLEN-BOGEN at the termination of the proceedings in this case, he would, in my judgment, have been supremely derelict in the discharge of his duties if he had *not* appointed a liquidating trustee. He was required to

---

* What Mr. Justice JONES said in his Dissenting Opinion in the case of *Indiana Twp. Lines Alteration Case*, 373 Pa. 319, 329, might well apply here, i.e., ". . . It is regrettable that the majority have not seen fit to abide by statutory law as decisionally established."

do so not only because of the quoted statute but because of the facts which imperiously dictated that he call upon the inherent powers of the judiciary to protect the dignity of the law and the integrity of the Court's decrees.

The Attorney General in his Complaint in Quo Warranto asserted, as already stated, that the "said [defendant] corporation has, from time to time, engaged in soliciting funds for the support of communistic projects and for the benefit of known communists."

Up until the time of the surrender of the charter, no evidence had been presented to refute this charge. Thus, the action of this Court will now permit the unknown officers of this organization to again use whatever funds were illegally solicited "for the support of communistic projects and for the benefit of known communists."

Judge ELLENBOGEN very properly said in his Opinion: "If the charges in this complaint are true, and the Attorney General of this Commonwealth says they are true, we cannot be certain that these men will use these assets to serve and advance literature, culture, sciences, and the arts; to the contrary, there is reasonable ground to believe that they will use them to serve the aims and purposes of the Communist Party and the Communist Revolution."

Judge ELLENBOGEN also said with infinite good sense: "To have permitted the officers of the defendant corporation to liquidate the assets of the corporation and to dispose of the same as they saw fit, in the teeth of the allegations that these assets are being used to advance the purposes of the Communist Party, would appear to be a violation of the Act of December 21, 1951, P. L. 1712, which reads as follows:

'The Communist Party of the United States in Pennsylvania and all other organizations, no matter under

what name, whose object or purpose is to overthrow the Federal or State Government by force and violence, are hereby declared illegal and not entitled to any of the rights, privileges and immunities attendant upon legal bodies created under the jurisdiction of the Commonwealth of Pennsylvania, or any political subdivision thereof; and whatever rights, privileges and immunities heretofore granted to said party and other organizations with the same revolutionary purpose by the Commonwealth of Pennsylvania, the same are hereby terminated.' "

The purpose of the Yiddisher Kultur Farband as announced in the original application for a charter was a praiseworthy one. As the Court was deceived by the applicants for the charter, some of the public may also have been so deceived, and it is very probable that persons contributed to the project out of a genuine desire to see Jewish culture encouraged. If the Court-appointed trustee had been permitted to administer the dissolution of the corporation, the resulting funds, under the salutary cy pres doctrine, could have been applied to the excellent purposes initially announced, and the whole disturbing litigation would have ended wisely and happily for all good persons concerned.

The Majority says that according to its interpretation of the case of *Commonwealth v. Vestra,* 156 Pa. 531, "the regular and ordinary course of the administration of the assets is by the officers of the corporation as trustees." But who are the officers of the Yiddisher Kultur Farband? Not even dynamite could have blasted that information from the reputed president Herman Gordon or his counsel, Hymen Schlesinger. The record is replete with interrogations seeking the names of the officers of this organization but all these efforts foundered on the rocks of the

belligerent muteness of Herman Gordon and Attorney Schlesinger: "THE COURT: Mr. Schlesinger, have you advised the Attorney General of the names of the officers and members of this corporation? MR. SCHLESINGER: I have given the Attorney General no information whatsoever. We are an adverse party, and I have refused to give them any information about my client." On one occasion Mr. Schlesinger even moved to disqualify the Judge because the Judge asked for the names of the officers!

In a record covering 800 typewritten pages, there is not the slightest indication as to the identity of the persons who, according to the Majority, are to receive the funds of the illegitimate Farband. Throughout this forest of transcript only two persons appeared who could possibly qualify as recipients of the funds: Schlesinger and Gordon. Mr. Schlesinger must be ruled out since there is no evidence he is an officer or member of the association, although he was present at the election of Gordon as president. Is Gordon then, for the absence of a worthier candidate or candidates, to become the beneficiary of the money to be realized in the sale of the Farband's premises? Could the Court below have conscientiously turned over the assets of a defunct organization to a person who under oath replied to questions as follows? "Q. Would you say in all fairness then and honesty that you don't know who runs this organization? A. Right. Q. And it might not even be any of the officers; is that right? A. It is possible. Q. It might be someone that is not even a member of this organization; is that right? A. That's possible, too. Q. *It might be the Communist organization, mightn't it?* A. It might even be as any other organization, for all I know. I don't know, and I cannot commit myself to anybody that might run it. . . . Q. Mr. Gordon, are the premises open now?

A. I don't know. I didn't go to see. Q. Who has a key? A. I do not know. Q. Do you? A. No. Q. If you want to get into the place, who opens it for you? A. I'd have to—wanted to go in first, and see, have to inquire. So far I never went in unless I got a card there was going to be a meeting. Q. Who hires the employees there? A. I don't know. Q. You haven't any idea? A. No. Q. The answer is no. You shook your head. A. No. Q. Do you know the names of any employees? A. I do not."

It is no wonder that Judge ELLENBOGEN refused to place so serious a matter as the liquidation of a dissolved corporation into the hands of a person so cunning of answer, so shiftless of responsibility and so unreliable and uncooperative in his dealings with the Court. And it is to me a greater wonder that the Majority of this Court criticizes the learned and conscientious Court below for doing what was so obviously and impellingly its duty.

The Majority Opinion carries a tone of censure which is entirely unwarranted. Judge ELLENBOGEN is an exceedingly able and studious judge of 17 years' distinguished service on the bench. The imputations of the Majority are gratuitous and unjust. They are not supported by the record and they transcend the boundaries of logic and fair dealing.

The Majority says, for instance: "Mr. Sherman's actions at the trial indicate that he was laboring under the misapprehension that the criminal and civil aspects of this case could both be tried in the present proceeding. Unfortunately the court seemed to be of the same opinion." The short answer to this observation is that if Judge ELLENBOGEN intended to try the civil and criminal aspects of this case in the same proceeding, he would not have urged Herman Gordon to surrender the charter and he would not have halted the

taking of testimony. He would have proceeded to the end because the Commonwealth had many witnesses yet to call and he could then have sat as a committing magistrate to pass upon alleged criminal offenses. He did not, however, do this.

The Majority says further: "Although the trial judge on several occasions stated to Mr. Sherman that remarks made by him were irrelevant, in the long run he permitted him to indulge in violent diatribes accusing members of the defendant Association of subversive activities, which unquestionably would have required the grant of a new trial if the case had gone to the jury and resulted in a verdict against the defendant." Since the very purpose of the proceeding was to ascertain whether the Farband was engaged in subversive activities (so as to determine whether the charter should be revoked), it is not clear what the Majority means by saying that the reference to subversive activities was improper. How can a trial having for a main issue the subject of Communism, Communist Party and subversive activities exclude evidence on Communism, Communist Party and subversive activities?

The quotation by the Majority from the case of *Schlesinger Petition,* 367 Pa. 476, is entirely inappropriate. To even suggest that the proceedings in this case were "arbitrary and unjudicial" can only mean one of two things: either a dogmatic appraisement of the record unrelated to its contents or a deliberate determination to censure regardless. My study of the record brings me to the conclusion that Judge ELLEN-BOGEN was respectful of precedent, obedient of both substantive and procedural law, patient, forbearing, reflective and guided only by the determination to see that justice was done. Contrary to what the Majority has said by its quotation from the *Schlesinger* case, su-

pra, Judge ELLENBOGEN did in fact uphold "all our cherished traditions of law and legal procedure." If fault were to be found it would have to be that the Trial Judge was too tolerant of Mr. Schlesinger's outrageous conduct throughout the trial. It is to be noted also that since the Court found that the Farband was engaged in illegal activities, Judge ELLENBOGEN would have been justified in holding the officers of the Farband in contempt of court for operating an illegal enterprise under the supposed authorization of the Court which had been fraudulently obtained. He did not, however, take any punitive action.

Although the Majority has dwelt on supposed irregularities in the Court below (none of which I have found supported by the record), it has said nothing about the fact that the appeal to this Court was in itself flagrantly irregular. At the termination of any trial in a lower Court, the invariable procedure for the losing party is to file exceptions to the jury's verdict or Court rulings and argue those exceptions before a Court en banc. That was not done here. Although Mr. Schlesinger had withdrawn from the case, he then appealed *directly* to this Court. He did not ask that the defendant corporation be permitted to withdraw its surrender of the charter, he did not request the lower Court to vacate its order of revocation, he did not seek a new trial. Ignoring every stairway of accepted approach to this Court, he leaped the barriers of intermediate procedure and appeared here, without this Court even inquiring as to how he managed his unorthodox ascent.

I regard this purposeful evasion of the rules of established appellate procedure as a very serious matter. It is not proper for a losing party to appeal to this Court without first exhausting his remedies in the Court below. Therefore, so far as I am concerned,

the Majority's laxness in enforcing the rules against Mr. Scheslinger for his unauthorized appearance here is not to be taken as warrant for other litigants to do likewise.

Justice CLARK of the United States Supreme Court began a Dissenting Opinion handed down on June 6, 1955, with the following: "To borrow a phrase from Mr. Justice HOLMES, the opinion of the Court 'just won't wash.' "* The same could be said of the Opinion of the Court in this case: It has prevented a Court of Common Pleas from completing a task before it; it has allowed a Communist-front organization to escape an accounting to the Court it has defrauded, and, as a result, its final dissolution will remain in a vague, unsettled state.

There is now no decision as to who is to pass title to the property of this deceased and corrupt organization: Gordon has not qualified as an officer with absolute powers and the other officers remain in the phantom land of anonymity or even non-existence. Thus a valuable property will remain unused and unusable, bearing forever the taint of its having been employed as a rendezvous for operations against the security and the well-being of the United States.

The Majority Opinion will further permit a Communist organization to apply funds obtained under false pretenses to unknown purposes; it will permit unknown individuals to receive money accumulated through the operations of a corporation which has been officially declared illegal.

It won't wash.

---

* *Williams v. Georgia*, 349 U. S. 375.